308 Ga. 660
FINAL COPY

S20A1029.  BARROW v. RAFFENSPERGER.
S20A1031.  BESKIN v. RAFFENSPERGER.

NAHMIAS, Presiding Justice.

These cases involve challenges to Secretary of State Brad Raffensperger's decision to cancel the election originally scheduled for May 19, 2020, for the office of Justice of the Supreme Court of Georgia held by Justice Keith R. Blackwell. Justice Blackwell's current term is set to end on December 31, 2020, and the next standard six-year term for his office would begin on January 1, 2021.[1] However, on February 26, Justice Blackwell submitted a letter to Governor Brian P. Kemp resigning from his office effective November 18, 2020. The Governor accepted Justice Blackwell's resignation and announced that he would appoint a successor to the office. Justice Blackwell continues to serve as a full-fledged Justice

---

[1] We recognize that on April 9, the election for various state and federal offices scheduled for May 19 was postponed until June 9 due to the public health crisis resulting from COVID-19. For simplicity, we will continue to refer to the election at issue in these cases as the May 19 election.

of this Court, and he plans to do so until November 18.

The Secretary canceled the May 19 election for the next term of Justice Blackwell's office on the ground that his resignation, once it was accepted, created a vacancy that the Governor could fill by appointment, and thus no election was legally required. The appellants in these cases, John Barrow and Elizabeth A. Beskin, each then tried to qualify for that election but were turned away by the Secretary's office. They each then filed a petition for mandamus in the Fulton County Superior Court, seeking to compel the Secretary to allow qualifying for, and ultimately to hold, the May 19 election for the next term of Justice Blackwell's office. Beskin also asserted that the Secretary's decision violated her federal constitutional rights. The trial court denied the mandamus petitions and rejected Beskin's federal claims, agreeing with the Secretary that a current vacancy was created in Justice Blackwell's office when his resignation was accepted by the Governor, which gave rise to the Governor's power to appoint a successor.

Barrow and Beskin appeal from the trial court's orders. They

both argue that the court should have granted their petitions because there is no current vacancy in Justice Blackwell's office that the Governor can fill by appointment before the May 19 election and because the Secretary has no discretion to cancel a statutorily required election. Beskin also argues that she is entitled to relief based on her federal claims.

As explained in detail below, we hold that while the trial court's reasoning was mistaken, its conclusion that the Secretary of State could not be compelled by mandamus to hold the May 19 election for Justice Blackwell's office was correct. Under the Georgia Constitution and this Court's precedent, a vacancy in a public office must exist before the Governor can fill that office by appointment, and a vacancy exists only when the office is unoccupied by an incumbent. Because Justice Blackwell continues to occupy his office, the trial court erred in concluding that his office is presently vacant; accordingly, the Governor's appointment power has not yet arisen.

Unlike earlier Georgia Constitutions, however, our current Constitution, which took effect in 1983, clearly provides that when

an incumbent Justice vacates his office before the end of his term, his existing term of office is eliminated, and the successor Justice appointed by the Governor serves a new, shortened term that is unrelated to the previous incumbent's term. Consequently, even if Justice Blackwell's office is not vacant yet, if his accepted resignation will undoubtedly create a vacancy in his office on November 18, his term of office will go with him, and the next six-year term of his office that would begin on January 1, 2021, will never exist. The next election will be in 2022, for the next term of the *appointed* Justice's office; the May 19, 2020, election for the next term of Justice Blackwell's office will be legally meaningless (as well as misleading to voters and the public); and the Secretary cannot be compelled by mandamus to conduct a legally nugatory election.

These cases therefore turn on the question of whether Justice Blackwell's prospective resignation, accepted by the Governor, is irrevocable, so that a vacancy in his office is inevitable by November 18. Barrow argues that Justice Blackwell could lawfully withdraw his resignation before its effective date, whereas Beskin contends

that the prospective resignation, having been accepted by the Governor, is irrevocable. We conclude as a matter of Georgia law that a Justice's unequivocal, written resignation, once unequivocally accepted, cannot be withdrawn, even with the consent of the Governor. Accordingly, Justice Blackwell's office will become vacant no later than November 18, and the May 19 election for his office would be an election to fill a future term that will never exist. The trial court therefore properly denied Barrow's and Beskin's petitions for a writ of mandamus requiring the Secretary to conduct that legally nugatory election. Because Beskin's federal claims are derivative of her claim that the Secretary violated state election law, those claims fail as well. In sum, although the trial court's reasoning was wrong, its ultimate judgments were right, and we therefore affirm them. See *Merchant Law Firm, P.C. v. Emerson*, 301 Ga. 609, 614 (800 SE2d 557) (2017) (affirming a trial court's dismissal of a mandamus claim as "right for any reason").

1. *Stipulated facts and procedural history.*

In the trial court, the parties stipulated to the following

pertinent facts.[2] Justice Blackwell originally took office on this Court in July 2012 after his appointment to fill a vacancy. He was then elected in May 2014 to serve a six-year term of office as a Justice beginning on January 1, 2015, and ending on December 31, 2020. His office was initially scheduled for election in the nonpartisan general election on May 19, 2020, for the six-year term beginning on January 1, 2021, with candidates scheduled to qualify for that election between March 2 and March 6, 2020.

On February 26, however, Justice Blackwell submitted a letter to Governor Kemp tendering his "resignation from the Supreme Court, effective November 18, 2020." The Governor responded by letter to Justice Blackwell dated the same day, saying: "I appreciate you taking the time to apprise me of your resignation, effective November 18, 2020. Your resignation as Justice of the Supreme Court of Georgia is hereby accepted[.]" Justice Blackwell continues

---

[2] We note that Justice Blackwell is not a party in either of these cases, and while he was subpoenaed as a witness in the trial court, his testimony (like that of all the witnesses) was presented by stipulation. Thus, all of the evidentiary facts that the parties deemed pertinent are undisputed.

to occupy his office as a Justice of this Court and to perform the ordinary duties and functions pertaining to that office.

On March 1, the Governor notified the Secretary of State that he intended to fill Justice Blackwell's office (and some other offices) by appointment. Following that notice, the Secretary decided to cancel candidate qualifying for the May 19 election for Justice Blackwell's office and directed his staff to publicize that decision and not to accept qualifying documents and fees for the election for that office. Barrow and Beskin each then attempted to qualify for election to Justice Blackwell's office, but the Secretary's staff refused to accept their qualifying documents and fees. Later that week, Beskin qualified as a candidate for election to the office currently held by Justice Charles J. Bethel, which was also scheduled to take place on May 19.

Barrow and Beskin each then filed a petition for mandamus against the Secretary in Fulton County Superior Court, asking the court to order the Secretary to reopen qualifying and hold the election for Justice Blackwell's office for the term beginning on

January 1, 2021. In addition, Beskin sought injunctive relief under 42 USC § 1983 and attorney fees and litigation costs under 42 USC § 1988, claiming that the Secretary acted under color of state law to violate her "right and privilege to qualify as a candidate for office and to vote for the candidate of her choice" under the United States Constitution.

After a joint hearing on the cases on March 13, the trial court denied both mandamus petitions on March 16 in separate but similar orders, concluding that pursuant to OCGA § 45-5-1 (a) (2), Justice Blackwell's office was vacated when the Governor accepted his resignation, triggering the Governor's appointment power and rendering an election for the office for the term beginning on January 1, 2021, no longer legally required. The court summarized its analysis as follows:

> This Court finds that, under the express language of the Georgia Constitution and OCGA § 45-5-1, a vacancy existed for Justice Blackwell's seat as of February 26, 2020 and once Governor Kemp notified the Secretary of State of Governor Kemp's decision to fill the seat via appointment, Secretary Raffensperger no longer was under a statutory legal duty to hold qualifications for

Justice Blackwell's seat.

The court also denied Beskin's federal claims, concluding that she failed to state a claim under 42 USC § 1983 because she did not "show that her fundamental right to vote has been denied or violated by the Governor's lawful use of the appointment power in this case." The court "assume[d], without deciding, that Petitioner Beskin's claims are not moot."

On March 18, Barrow filed an emergency motion in the Court of Appeals asking for expedited consideration of an appeal from the trial court's order. The motion was transferred to this Court on March 19 because the case involves an election contest within our exclusive appellate jurisdiction. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (2). That same day, Beskin filed a similar emergency motion in this Court. On March 23, we granted the emergency motions in part, ordering expedited briefing.[3] Barrow's appeal was

---

[3] Barrow's and Beskin's principal briefs were due on Thursday, March 26, the Secretary's response briefs on Monday, March 30, and the reply briefs on Tuesday, March 31. One of the issues that we directed the parties to address was what remedies may be available that would alleviate the need to decide

docketed in this Court on March 24, and Beskin's on March 25. No party requested oral arguments. Because the mandamus issues raised in both cases are similar, we have consolidated the cases for opinion.[4]

2. *Jurisdictional issues.*

Before we can address the merits of Barrow's and Beskin's

---

these cases on an extremely expedited basis, given initial representations that absentee ballots for the May 19 election were due to be mailed to voters no later than April 4. The Court expresses its appreciation to counsel for the parties for meeting those tight deadlines in the midst of the ongoing statewide judicial emergency caused by the COVID-19 pandemic.

After reviewing the parties' briefs, which included the Secretary's explanation of legal and administrative issues regarding election planning, particularly during the COVID-19 crisis, and the Secretary's and Beskin's agreement that adequate relief could be provided if necessary by postponing the election for Justice Blackwell's office to a date later this year, the Court issued an order on April 3 explaining that we had determined that adequate remedies could be provided to Barrow and Beskin in the event they prevailed, even after absentee ballots for the May 19 election were distributed, and thus that we would not issue an immediate opinion in these cases, although an opinion would be issued as soon as practicable. On April 9, we denied Barrow's motion to reconsider that order and to issue an opinion without delay. Barrow also filed a supplemental brief on May 12, which we have considered. As all the parties recognize, these cases present important legal questions as to which this Court's answers will create important precedent; the Court has accordingly worked as quickly as possible under current conditions to issue an opinion that gives those matters the complete and careful consideration they deserve.

[4] Two amicus curiae briefs have been filed in support of Barrow — one by the Advocacy for Action Fund and the other by Fair Fight Action, Inc., The Urban League of Greater Atlanta, Inc., and the Georgia NAACP.

claims, we must resolve two jurisdictional arguments raised by the Secretary: first, that Barrow and Beskin could appeal the trial court's orders only by filing and having this Court grant applications for discretionary review pursuant to OCGA § 5-6-35 (a) (1); and second, that Beskin's case is moot because she has qualified as a candidate in the May 19 election for Justice Bethel's office. We conclude that neither of those arguments has merit.

(a) *An application for discretionary review is not required to appeal these cases.*

Under OCGA § 5-6-35 (a) (1), an application for discretionary review is required to appeal "decisions of the superior courts reviewing decisions of . . . state . . . administrative agencies," even in cases involving the grant or denial of mandamus that would otherwise be immediately appealable under OCGA § 5-6-34 (a) (7). See *Selke v. Carson*, 295 Ga. 628, 629 (759 SE2d 853) (2014). We have explained, however, that OCGA § 5-6-35 (a) (1) applies only to administrative agency decisions that are "adjudicatory in nature, as opposed to executive or legislative." *Wolfe v. Bd. of Regents of the*

*Univ. Sys. of Ga.*, 300 Ga. 223, 227-228 (794 SE2d 85) (2016). The Secretary argues that his office is a state administrative agency, citing *Handel v. Powell*, 284 Ga. 550, 550, 552 (670 SE2d 62) (2008), and that his decision to cancel the May 19 election for Justice Blackwell's office, and thus not to allow Barrow and Beskin to qualify for that election, was adjudicatory in nature because it involved "an assessment of the particular facts surrounding" the election — in particular, that Justice Blackwell had resigned and the Governor had accepted his resignation and intended to fill the vacancy by appointment — rather than being "of general and future effect." *Wolfe*, 300 Ga. at 228.

This Court's cases may not define with precision the parameters of an "adjudicatory" administrative decision, but it is clear to us that the decision at issue here was not adjudicatory in nature. The Secretary's decision to cancel the election for Justice Blackwell's office and to direct his staff not to accept qualifying documents and fees for the canceled election was not made in the context of a dispute involving any particular person or entity; there

was no notice or opportunity to be heard about the issues, or any apparent administrative procedure; there was no explanation provided for the decision when it was made; and the decision *was* general and prospective, affecting the upcoming qualifying period and May 19 election for Justice Blackwell's office for *all* potential candidates and *all* Georgia voters. These cases are clearly distinguished from the cases on which the Secretary relies. See *Wolfe*, 300 Ga. at 227-228 (holding that the Board of Regents's decision to terminate Professor Wolfe was adjudicative in nature because it "was not of general and future effect; rather, it was based on an assessment of the particular facts surrounding a single person's past conduct, it involved an application of Board rules and policies to that conduct, and it had the immediate and specific consequence of terminating Wolfe's contract to serve as a professor"); *Handel*, 284 Ga. at 550-551 (involving an appeal brought by discretionary application from the superior court's reversal of the Secretary of State's decision, made after an evidentiary hearing and ruling by an administrative law judge, that a particular candidate

did not fulfill the residency qualification for the office for which he had filed qualifying documents). Accordingly, Barrow and Beskin were not required to file applications for discretionary review in order to appeal their cases; their notices of appeal were sufficient.

(b) *Beskin's case is not moot.*

At the hearing held by the trial court, the Secretary argued that Beskin's claims were moot because she had qualified as a candidate in the May 19 election for Justice Bethel's office and thus had availed herself of an adequate alternative remedy to the mandamus relief that she was requesting. In response, Beskin asserted that her case was not moot because, if the Secretary were ordered to reopen qualifying for Justice Blackwell's office, she could withdraw from the election for Justice Bethel's office and instead qualify for election to Justice Blackwell's office, noting that OCGA § 21-2-134 (a) (2) allows candidates in a general primary to "withdraw as a candidate after qualifying but prior to the date of the general . . . primary." Beskin also argued that, in any event, the Secretary's actions violated her rights as a voter. The trial court concluded that

Beskin was not entitled to relief on the merits, so it declined to address the mootness issue.

On appeal, the Secretary points to OCGA § 21-2-136, which says that a person cannot "be a candidate" for more than one office as a Justice to be filled in the same election. Thus, he contends, Beskin would not benefit from a judgment directing him to open qualifying for a May 19 election for Justice Blackwell's office, because qualifying for the May 19 election for Justice Bethel's office has closed and, having "be[en] a candidate" for that office, OCGA § 21-2-136 would render her ineligible to qualify for Justice Blackwell's office in the same election. With respect to Beskin's claims as a voter, the Secretary argues that her petition alleged only an injury on behalf of "all voters, including Beskin" for failing to conduct the election for Justice Blackwell's office and that she therefore has not sufficiently alleged an injury or sought a remedy for her mandamus claim relating to conducting the election as a general matter.

We begin our analysis by noting that the trial court erred in

deciding the merits of Beskin's claims without first determining whether her case was moot, because "mootness is an issue of jurisdiction and thus must be determined before a court addresses the merits of a claim." *Shelley v. Town of Tyrone*, 302 Ga. 297, 308 (806 SE2d 535) (2017). A claim that is moot must be dismissed, not adjudicated. See id. See also *Scarbrough Group v. Worley*, 290 Ga. 234, 236 (719 SE2d 430) (2011) ("We address first the issue of mootness because the dismissal of a moot appeal is mandatory."). The trial court's error on this point does not require us to vacate its judgment as to Beskin, however, because her claims are not moot.

A case is moot "when it seeks to determine an issue which, if resolved, cannot have any practical effect on the underlying controversy, or when such resolution will determine only abstract questions not arising upon existing facts or rights." *Pimper v. State of Ga.*, 274 Ga. 624, 626 (555 SE2d 459) (2001) (footnotes omitted). See also *Randolph County v. Johnson*, 282 Ga. 160, 160 (646 SE2d 261) (2007) ("An appeal becomes moot if the rights insisted upon could not be enforced by a judicial determination."). Moreover, when

an alternative remedy exists that is as "complete and convenient as mandamus, the extraordinary remedy [of mandamus] will not lie." *Tobin v. Cobb County Bd. of Ed.*, 278 Ga. 663, 663 (604 SE2d 161) (2004). The same is true as to injunctive relief. See id.

In Beskin's case, however, we need not decide whether her qualifying for the election for Justice Bethel's office constituted an adequate alternative remedy to her qualifying for the election for Justice Blackwell's office, or whether having qualified for the election for Justice Bethel's office, OCGA § 21-2-136 would preclude her from withdrawing her candidacy for the May 19 election for Justice Bethel's office if a May 19 election were held for Justice Blackwell's office. That is because Beskin brought her claims both as a potential candidate *and* as a voter. Whether or not she can run for another office as a Justice, she has a right as a Georgia voter to pursue a mandamus claim to enforce the Secretary's duty to conduct an election that is legally required, which is the duty she claims the Secretary has with regard to the May 19 election for Justice Blackwell's office. She does not need to establish any special injury

to bring that claim as a voter. See OCGA § 9-6-24 ("Where the question is one of public right and the object is to procure the enforcement of a public duty, no legal or special interest need be shown, but it shall be sufficient that a plaintiff is interested in having the laws executed and the duty in question enforced."); *Manning v. Upshaw*, 204 Ga. 324, 324 (49 SE2d 874) (1948) ("Where a citizen, taxpayer, and voter files a petition for the writ of mandamus against the mayor and councilmen of a municipality, asserting that they are extending the terms of office and refusing to call an election to elect their successors in violation of the [city charter], and are predicating their position upon the provisions of an act of the General Assembly . . . , the voter has such interest and right, and sustains such injury to himself by the enforcement of the terms of the act, as to authorize him to attack the act as being unconstitutional.").

Moreover, the Secretary's argument that Beskin did not seek a remedy relating to conducting the election as a general matter is not supported by the record. In her petition, in addition to asking the

trial court to order the Secretary to accept her own qualifying documents and fees, Beskin asked the court to compel the Secretary "to discharge all of his duties in connection with conducting an election contest for Justice Blackwell's seat as previously scheduled for May 19, 2020, including conducting such election," and she also requested such "other and further relief as may be just and equitable."

Accordingly, resolving Beskin's claims in her favor would have a practical effect on this controversy — namely, it would lead to an order requiring the Secretary to reopen qualifying and hold the May 19 election for Justice Blackwell's office, and Beskin could vote in that election whether or not she could also be a candidate in it. We therefore can properly turn to addressing the merits of Barrow's and Beskin's claims.

3. *The system for selecting Supreme Court Justices established by the 1983 Georgia Constitution.*

Judges in this state and around our nation have historically been, and still are, selected to fill their offices in a wide variety of

ways. See, e.g., U. S. Const., Art. II, Sec. 2 and Art. III, Sec. 1 (establishing the Supreme Court of the United States, with Justices appointed by the President with the advice and consent of the Senate, who hold office "during good Behaviour"); Ga. Const. of 1877, Art. VI, Sec. II, Pars. I and IV (establishing a Supreme Court of Georgia with three Justices, serving six-year terms, elected by the General Assembly).[5]

Under Georgia's current Constitution — the Constitution of 1983 — most judges in this state, including the Justices of the Supreme Court, fill their offices in two different ways, for terms of two different types. The pertinent constitutional provisions are found in Section VII ("Selection, Term, Compensation, and Discipline of Judges") of Article VI ("Judicial Branch").[6]

---

[5] The National Center for State Courts has compiled a summary showing the many different ways in which the 50 states and the District of Columbia currently select their judges. See http://judicialselection.us/ judicial_selection/ methods/selection_of_judges.cfm?state= (last visited May 5, 2020).

[6] The discussion that follows will focus on Justices, but it applies as well to judges of the Court of Appeals and to superior and state court judges (and draws on precedents involving those judges), except that the standard term of office for superior and state court judges is four rather than six years. See Ga.

(a) *Election to a standard six-year term.*

Paragraph I (a) of our Constitution's judicial selection section says: "All Justices of the Supreme Court . . . shall be elected on a nonpartisan basis for a term of six years. The terms of all judges thus elected shall begin the next January 1 after their election." Thus, all Justices who are elected to fill their offices serve a standard term of six years, beginning on January 1 of the year following their election.

To implement this provision, a nonpartisan election for that term must be held in the year at the end of which the incumbent Justice's existing term will expire. See OCGA § 21-2-9 (b) ("Justices of the Supreme Court . . . shall be elected in the nonpartisan general election next preceding the expiration of the term of office."). The election process includes qualifying candidates for the office, holding the general election, and — if no candidate receives a majority of the votes — holding a runoff election. As will be pertinent to the

---

Const. of 1983, Art. VI, Sec. VII, Par. I. Much but not all of the discussion also pertains to judges of other classes of court.

discussion of dates in some of the cases and other materials referenced below, the timing of these steps has changed over the years.

When the 1983 Constitution was ratified and until 2012, nonpartisan elections for Justices were held in conjunction with the general election in early November of even-numbered years, with qualifying held several months earlier. See Ga. L. 1983, pp. 1194, 1197; Ga. L. 2011, pp. 678, 680. In 2011, OCGA § 21-2-138 was amended to make the nonpartisan general election coincide with the general *primary* election, which typically occurs in May of each even-numbered year (but occurs in July in the first such election after the decennial census results are released); if needed, a runoff election is held in conjunction with the runoff primary election. See Ga. L. 2011, p. 678, §§ 1, 3. See also OCGA §§ 21-2-150 (establishing the date of general primary elections), 21-2-501 (a) (2) (establishing the date of primary runoff elections). Qualifying for the nonpartisan general election for Justice of the Supreme Court now takes place 11 weeks in advance of the election. See OCGA § 21-2-132 (c) (1)

(establishing the dates for qualifying for the nonpartisan general election for Justice of the Supreme Court). Under these statutes, this year's general nonpartisan election was scheduled for May 19, with qualifying from March 2 to 6.[7]

(b) *Appointment to an initial, individualized shorter term.*

But all Justices do not *initially* take office by election for a six-year term. Under Paragraph III of the Constitution's judicial selection section, when a vacancy arises in a Justice's office, it is filled not by election but rather by gubernatorial appointment. See Ga. Const. of 1983, Art. VI, Sec. VII, Par. III ("Vacancies shall be filled by appointment of the Governor except as otherwise provided by law in the magistrate, probate, and juvenile courts. . . ."). This Court recently held that the term "vacancy" as used in Paragraph III means "a public office without an incumbent." *Clark v. Deal*, 298 Ga. 893, 896 (785 SE2d 524) (2016). See also *Pittman v. Ingram*, 184

---

[7] The post-2011 timetable can leave a much longer period between the nonpartisan election (usually in May) and the beginning of the standard term of a Justice's office for which the election is held (on the next January 1) – more than seven months if there is no runoff, as opposed to less than two months under the prior timetable, when Justices were elected in November.

Ga. 255, 256-257 (190 SE 794) (1937) (explaining that an "'office is not vacant so long as it is supplied, in the manner provided by the [C]onstitution or law, with an incumbent who is legally qualified to exercise the powers and perform the duties which pertain to it'" (citation and punctuation omitted)). OCGA § 45-5-1 establishes several ways by which the public offices in Georgia may be vacated.[8]

---

[8] OCGA § 45-5-1 says in full:

(a) All offices in the state shall be vacated:

(1) By the death of the incumbent;

(2) By resignation, when accepted;

(3) By decision of a competent tribunal declaring the office vacant;

(4) By voluntary act or misfortune of the incumbent whereby he is placed in any of the specified conditions of ineligibility to office;

(5) By the incumbent ceasing to be a resident of the state or of the county, circuit, or district for which he was elected;

(6) By failing to apply for and obtain commissions or certificates or by failing to qualify or give bond, or both, within the time prescribed by the laws and Constitution of Georgia; or

(7) By abandoning the office or ceasing to perform its duties, or both.

(b) Upon the occurrence of a vacancy in any office in the state, the officer or body authorized to fill the vacancy or call for an election to fill the vacancy shall do so without the necessity of a judicial determination of the occurrence of the vacancy. Before doing so, however, the officer or body shall give at least ten days' notice to the person whose office has become vacant, except that such notice shall not be required in the case of a vacancy caused by death, final conviction of a felony, or written resignation. The decision of the officer or body to fill the vacancy or call an election

The next paragraph in the Constitution — Paragraph IV — specifies the term of office of a Justice who is appointed to fill a vacancy in an otherwise elected judicial office:

> **Period of service of appointees.** An appointee to an elective office shall serve until a successor is duly selected and qualified and until January 1 of the year following the next general election which is more than six months after such person's appointment.

Ga. Const. of 1983, Art. VI, Sec. VII, Par. IV (emphasis in original).

Read together, Paragraphs III and IV make it clear that a judge appointed to an elective office does not inherit and serve out the remainder of his or her predecessor's term of office; that unexpired term, we have explained before, is "'eliminate[d]'" when the incumbent judge vacates the office. *Heiskell v. Roberts*, 295 Ga. 795, 799 (764 SE2d 368) (2014) (quoting *Perdue v. Palmour*, 278 Ga. 217, 221 (600 SE2d 370) (2004) (Carley, J., concurring)). See also

---

to fill the vacancy shall be subject to an appeal to the superior court; and nothing in this subsection shall affect any right of any person to seek a judicial determination of the eligibility of any person holding office in the state. The provisions of this subsection shall apply both to vacancies occurring under this Code section and to vacancies occurring under other laws of this state.

*Palmour*, 278 Ga. at 218 (describing the operation of these constitutional provisions as "clear and unambiguous"). Instead, an appointed judge has an "entirely new and shortened initial term of office," *Heiskell*, 295 Ga. at 798, the length of which depends on the date the judge was appointed, the date he or she takes office, and the date of the next nonpartisan general election. See id. (explaining that the term of an appointed state court judge "is not determined at all by his predecessor's term of office, and indeed cannot be determined until he is appointed and assumes the office").[9]

If the nonpartisan general election is in May, the individualized term of an appointed Justice may be as short as 14

---

[9] Barrow argues that when a Justice's office is vacated, the Justice's term of office does not end but rather continues until the date that an appointee fills the office. That argument is incorrect under the Constitution and our precedents, as *Palmour* illustrates. There, the trial court ordered a county election superintendent to conduct scheduled elections for state court judge and solicitor-general after the Governor had accepted the incumbents' resignations and announced his intent to fill the offices by appointment. See 278 Ga. at 217-218. This Court reversed that order because the offices at issue were vacated before the incumbents' terms of office ended; we did not consider whether the Governor had actually appointed anyone to fill the vacancies at issue, because it is the incumbent's vacating the office that eliminates the incumbent's term of office, not the appointment of a successor. See id. at 219-221.

months (if the appointment comes just over six months before the next election and the Justice takes office immediately) or as long as 28 months.[10] In any event, our Constitution and statutes ensure that the initial term of an appointed Justice will always be much shorter than the standard six-year term of an elected Justice.

(c) *The two ways of selecting Justices have equal constitutional status and work in tandem.*

Barrow, the amici, and the dissent argue that the Governor's power to appoint judges is an exception to the general rule that Justices are to be elected, and we did once describe it that way. See *Clark*, 298 Ga. at 895 n.2. That is true, but only in a broad sense: to continue in office for more than a couple years, every Justice must win election to one or more standard six-year terms, and over time Justices of this Court have served many more elected, six-year terms than appointed, shorter terms. But the second way by which Justices (and other judges) *initially* take and hold their offices — by

---

[10] When the nonpartisan general elections were held in November, the initial term of an appointed judge would be shorter – at least eight months and not more than 22 months. See *Palmour*, 278 Ga. at 220.

gubernatorial appointment — is not some sort of constitutionally inferior alternative to the election mechanism of Paragraph I. The constitutional provisions actually work in tandem: Paragraph I requires an election for a standard six-year term for a Justice, whenever such a term will actually exist; when a Justice's office is vacated before the end of his or her term, Paragraph III says that the Governor appoints a Justice to fill the office, and Paragraph IV says that the appointed Justice will serve a different, shorter term, at the end of which there will be an election if the Justice wishes to continue serving.

To be crystal clear, given the dissent's assertions that we are giving appointments precedence over elections: the 1983 Constitution does not *exempt* appointed Justices from elections, but it does say expressly and specifically *when* an appointed Justice must face election. To put this point in statutory terms, as noted earlier, OCGA § 21-2-9 (b) says that Justices "shall be elected in the nonpartisan general election next preceding the expiration of the term of office." When an incumbent Justice vacates his or her office

before his or her term ends, the date of "expiration of the term of office" changes from December 31 of the year in which the *prior incumbent's* term would have ended to December 31 of the year in which the *appointed Justice's* term will end as calculated based on Paragraph IV.

We cannot ignore the import of Paragraph IV's definition of the initial period of service for judges *appointed* to *elective* office, because it was a significant change from prior Georgia Constitutions, under which an appointed judge simply served out all or part of the unexpired term of the prior incumbent. See *Heiskell*, 295 Ga. at 799 (explaining that "'[u]nlike the prior constitutional provisions . . . , Art. VI, Sec. VII, Par. IV of the Georgia Constitution of 1983 eliminates the unexpired term of the vacant office,'" so "there is no longer such a thing as an appointment to serve out the 'unexpired term' of an appellate, superior, or state court judge" (citations omitted)); *Hooper v. Almand*, 196 Ga. 52, 58-62 (25 SE2d 778) (1943) (describing and applying the prior constitutional scheme). See also *Palmour*, 278 Ga. at 220 (discussing *Hooper*'s

"obsolescence"). When constitutional language is substantively changed, we must give that change effect. See, e.g., *Clark*, 298 Ga. at 898-899 (explaining that because later Constitutions omitted the provision in a 1906 constitutional amendment requiring newly created Court of Appeals judgeships to be initially filled by election, the later Constitutions indicated that such judgeships may be filled by appointment). See also *Ga. Dept. of Natural Resources v. Center for a Sustainable Coast*, 294 Ga. 593, 599 (755 SE2d 184) (2014) (overruling precedent that minimized the effect of a major change in constitutional language regarding sovereign immunity).

That this change in our constitutional system of selecting Justices was significant is further demonstrated by the fact that the serve-out-the-existing-term way of determining the initial term of appointed officials remains applicable to most other appointed public officials in Georgia and indeed to the subset of judges who serve in offices that are always appointed rather than elected. See Ga. Const. of 1983, Art. V, Sec. II, Par. VIII (a) ("When any public office shall become vacant by death, resignation, or otherwise, the

Governor shall promptly fill such vacancy unless otherwise provided by this Constitution or by law; and persons so appointed shall serve for the unexpired term unless otherwise provided by this Constitution or by law."); *Heiskell*, 295 Ga. at 799 ("The same Article and Section of the 1983 Constitution that abolished the old system for the selection and terms of office of appellate, superior, and state court judges explicitly preserved the then-existing system for '(a)ll other judges . . . until otherwise provided by local law' and authorized the filling of '(v)acancies . . . in the magistrate, probate, and juvenile courts' by methods other than gubernatorial appointment if 'otherwise provided by law.'" (quoting Ga. Const. of 1983, Art. VI, Sec. VII, Pars. I and III)). We have explained that the specific language of Paragraphs III and IV of the judicial selection section in Article VI prevails over more general provisions relating to the Governor's authority to fill vacancies in Article V. See *Palmour*, 278 Ga. at 219.[11]

---

[11] Notably, the two Georgia cases relied on by the dissent for the proposition that Paragraphs III and IV are inferior to Paragraph I and that

We have also explained that Paragraph IV represents "a practical balance between democracy and stability":

> [O]n one side of the coin, someone appointed to fill a vacancy occurring at the beginning of a six-year term will not be immune from voter consideration for that entire period; he would have to run in the next general election. On the other side of the coin, someone appointed between June and November of a general election year [when the nonpartisan general election was held in November] would not have to run immediately and would have a

---

"the appointment process is for emergency situations" were decided under the *pre-1983* judicial selection system that did not include Paragraph IV. See *Mitchell v. Pittman*, 184 Ga. 877, 885 (194 SE 369) (1937) (opinion of Russell, C. J., for an equally divided Court); *Stephens v. Reid*, 189 Ga. 372, 379 (6 SE2d 728) (1939). The only post-1983 case that the dissent cites, *Brooks v. State Bd. of Elections*, 848 FSupp. 1548, 1577 (S.D. Ga. 1994), is a curious choice for the dissent's argument. In that case, the federal district court recognized that under the 1983 Constitution, elections and appointments co-exist, with elections occurring when the judge's term of office is expiring: "The Georgia judicial electoral system involves aspects of both election and appointment. The vast majority of judges in this state have reached the bench via appointment. All judges and justices are subject to challenge in open elections at the expiration of *their* term of office." Id. at 1557 (emphasis added). The court further recognized that "[i]n [the 1983] Constitution, the people of the State of Georgia significantly increased the breadth of the Governor's authority to appoint." Id. at 1567. And ultimately, the court refused to approve a proposed settlement agreement which would have replaced contested elections entirely with a new system of judicial appointments and retention elections that "would violate Georgia statutory and constitutional law" and would, "through the coercive and injunctive powers of this Court as opposed to the normal legislative and political processes, effectively amend the 1983 Georgia Constitution." Id. at 1577. Similarly, this Court has no legitimate authority to effectively amend our current Constitution by judicial opinion by limiting the Governor's power to fill vacancies in judicial offices as stated in Paragraph III or by altering the term of service of the judges so appointed as stated in Paragraph IV.

little over two years to demonstrate his qualifications as a judge . . . .

*Palmour*, 278 Ga. at 220 (citation and punctuation omitted). Directly contrary to Barrow's and the dissent's argument, this Court has held that this approach

> was not intended to, nor does it in fact, disenfranchise voters. It is not in conflict with the mandate in [Paragraph I] that superior court and state court judges [and appellate judges] are to be elected on a nonpartisan basis for a four-year [or six-year] term. As its drafters envisioned, the six month provision gives the voters the right to select the holders of elective office, yet affords the appointee a sufficient opportunity to demonstrate the merit, or lack thereof, of the appointee's service.

Id. at 220-221. The people of Georgia endorsed this new approach when they ratified the 1983 Constitution. And in fact, the appointment mechanism for initial service of Justices provided in Paragraphs III and IV has been the norm, not the exception, in the more than 35 years that we have lived under this Constitution: of the 18 Justices who first took office during that time, all but one — Justice John J. Ellington — was initially appointed by a Governor to fill a vacancy and served an initial term not of six years, but

rather a shorter term calculated under Paragraph IV.

(d) *The effect of a vacancy on an election for a Justice's office.*

As just explained, when an incumbent Justice vacates his or her office before the end of his or her term, the incumbent's unexpired term disappears with the incumbent, along with any hypothetical future terms associated with that incumbent. The Governor then has the duty to fill the vacancy by appointment; the appointed Justice's term of office will be individualized and much shorter than the standard six-year term, calculated based on when he or she is appointed and fills the office; and the next election will be for a standard six-year term for the appointed Justice's office, not the prior incumbent's office. In short, when an incumbent Justice vacates office, any election to fill the next term of that Justice's office becomes nugatory, as there will be no such term of office for the candidate who wins the election to serve. Such elections are routinely not held, although we often do not even realize that has happened.

This point may be illustrated by considering several scenarios,

in all of which we will assume that incumbent Justice A was elected (or re-elected) in the May 2014 election to fill a standard six-year term running from January 1, 2015, until December 31, 2020, so that an election for the next term of his office would be planned for May 2020. First, assume that Justice A resigned shortly into his term, say in August 2015, and Justice B was promptly appointed and filled the vacant office that same month. Because Justice B was appointed more than six months before the next general election in May 2016, her initial term would continue only until December 31, 2016, and the election for the next term of the incumbent's office (now Justice B's office), which would be for a standard six-year term, would be held in May 2016. In this scenario, it seems obvious and uncontroversial that no election should be held four years later, in May 2020, to fill the next term of Justice A's office; by then, that seat would have long been filled by Justice B and then by whoever won the election for Justice B's office.[12]

---

[12] This type of scenario actually occurred recently. In May 2018, Justice Britt C. Grant, who had taken office by appointment in January 2017, was

Next, assume that Justice A — again elected in May 2014 to a six-year term expiring in December 2020 — did not vacate his office until August 2019, and the Governor appointed Justice B in September 2019. The next election more than six months after the appointment would be the May 2020 election. Justice B's initial term would therefore continue until December 31, 2020, and the election for a six-year term of her office would be held in May 2020. In this scenario, the election for Justice B's office would be on the same date as the election that would have been held for the next term in Justice A's office. But again, it seems obvious that only the election for the next term in the current incumbent's office (Justice B's office) would actually be held.[13]

---

elected to her first standard six-year term, which would run from January 1, 2018 until December 31, 2023. But Justice Grant resigned her office less than a year into that term, when she was confirmed as a federal appellate judge; Justice Sarah H. Warren was appointed to fill the vacancy in August 2018. The election for a standard six-year term of Justice Warren's office is on May 19, 2020 (now postponed to June 9). It would be absurd to think there will be an election in May 2023 for the next term of former Justice Grant's office.

[13] This type of scenario has occurred on several occasions. For example, Chief Justice Leah Ward Sears resigned in June 2009; her term otherwise would have ended on December 31, 2010, with an election to fill the next term in her office in November 2010. Now-Presiding Justice David E. Nahmias was

Finally, assume that Justice A resigned in April 2020, after the March 2 to 6 period for candidates to qualify for the May 19 election to fill the next term of his office. The election again would not need to be held. Justice A's term of office would be eliminated when his office was vacated, and the term of the Justice appointed by the Governor to fill the vacancy would continue until January 1 of 2023, the year following the nonpartisan general election at least six months after the appointment — the 2022 election.[14] The May 19, 2020 election for the next term of Justice A's office — a term that would never exist — would properly be canceled, even if one or more

appointed to fill that office in August 2009; because that was more than six months before the November 2010 election, his initial term also ended December 31, 2010, so an election was held in November 2010 for the next, standard six-year term of his office. There was no election for the next term of Chief Justice Sears's office. Similarly, Chief Justice Hugh P. Thompson resigned in January 2017; his term otherwise would have ended on December 31, 2018, with an election to fill the next term in his office in May 2018. Justice Michael P. Boggs was appointed to fill the vacancy. Because Justice Boggs's appointment was more than six months before the May 2018 election, his initial term also ended on December 31, 2018, and an election was held in May 2018 for the next, standard six-year term of his office. There was no election held for the next term of Chief Justice Thompson's office.

[14] The 2022 election would be in July rather than May, assuming that is the first general election after the 2020 census results are released.

candidates had already qualified for that election.[15] See *Hornsby v. Barnes*, 2002 U.S. Dist. LEXIS 27508, at *2-4, 9-10 (N.D. Ga. 2002) (finding no violation of Georgia election law in the cancellation of an election for the next term of office of a superior court judge, because the judge vacated his office by accepted resignation before the qualifying period and before the election, even though the Governor did not appoint a judge to fill that office until after the qualifying period ended).[16]

---

[15] This type of scenario also has recently occurred. In 2012, Chief Justice George H. Carley resigned effective on a date *after* the qualifying period for the election that would otherwise have been held for the next term of his office. (He had tendered his prospective resignation and it was accepted by the Governor before qualifying.) The election for his office was not held. Instead, the Governor promptly appointed Justice Blackwell to fill the vacancy, and Justice Blackwell's initial term continued until January 1 of the year following the next nonpartisan general election in 2014, when there was an election for Justice Blackwell's office (not Chief Justice Carley's office). Similarly, Justice Robert Benham resigned his office effective March 1, 2020, just before the qualifying period for the May 19 election that otherwise would have been held for the next term of his office. That election was canceled, and the Governor appointed Justice Carla Wong McMillian to fill the vacancy.

[16] The statements of the Georgia Constitution's drafters and the specific situations they thought they were addressing are not controlling as to the original public meaning of the constitutional text ultimately ratified by the people of Georgia. See *Olevik v. State*, 302 Ga. 228, 238-239 (806 SE2d 505) (2017). Because judicial elections were in November when the 1983 Constitution was being drafted, the period in which a post-election vacancy could arise was much shorter than it is today, see footnote 7 above, so it is not

(e) *The Secretary of State generally may be compelled by mandamus to conduct a legally required election, but not when the election will be legally nugatory.*

The mandamus statute, OCGA § 9-6-20, says in pertinent part:

> All official duties should be faithfully performed, and whenever, from any cause, a defect of legal justice would ensue from a failure to perform or from improper performance, the writ of mandamus may issue to compel a due performance if there is no other specific legal remedy for the legal rights . . . .

The Secretary of State has the official duty to conduct certain elections required by the Constitution and statutes, including elections for Justices of the Supreme Court. See Ga. Const. of 1983, Art. V, Sec. III, Par. III and Art. VI, Sec. VII, Par. I; OCGA §§ 21-2-

---

surprising that the drafters may not have discussed the situation we face in these cases. But it is worth noting that in discussing the changes that would be effectuated by the addition of Paragraph IV, the drafters of the 1983 Constitution contemplated, among other things, that a *pending* election might be rendered nugatory by the appointment of a judge to fill a vacancy within six months of the election for the next term of his predecessor's office:

> DEAN PATTERSON: One problem that might raise if you have a Judge appointed for a vacancy less than six months prior to the election and others qualified to run in that election—
> MR. DROLET: *That eliminates that election.*

Select Committee on Constitutional Revisions, 1977-1981, Transcripts of Meetings, Committee to Revise Art. VI, Vol. I, meeting of Sept. 9, 1977, p. 73. (emphasis added). We do not place much reliance on this comment, however, because such passing comments of an individual drafter do not control the meaning of the constitutional text; indeed, such comments may be taken entirely out of context — as is the comment quoted in footnote 28 of the dissent.

9 (b), 21-2-50. As demonstrated above, however, a vacancy in an incumbent Justice's office eliminates the need under the Constitution and statutes for an election for the next term of that Justice's office. Thus, when such a vacancy arises, the Secretary has no legal duty to conduct such an election and cannot be compelled by mandamus to do so. See *Palmour*, 278 Ga. at 221 (reversing the superior court's order directing the county election superintendent to conduct the elections for the next terms of office for a state court judge and a solicitor-general who resigned just before the qualifying period). As noted above, Secretaries of State appear to have routinely not conducted elections for the next term of office of resigning Justices — including the election for the next term of Chief Justice Carley's office, for which qualifying would have begun before his resignation became effective. As the Secretary has conceded in his brief here, however, he cannot lawfully cancel an election (or qualifying for an election) for the next term of an incumbent Justice's office simply because a vacancy in the Justice's office is expected or even highly likely to occur. That is because if the election

were canceled and the vacancy turned out *not* to occur, then there would be no one elected to serve in the next standard term of that office.

But if a vacancy in an incumbent Justice's office will *inevitably* occur before the Justice's term of office expires, the Secretary cannot be compelled by mandamus to conduct an election for the next term of that Justice's office. An election has legal meaning only if the candidate who wins will be entitled to take the office for which the election is conducted. As discussed above, under our Constitution, if an incumbent Justice's office becomes vacant before his or her existing term ends, that term and any future term associated with that Justice is eliminated, so an election to fill such a term will, in legal effect, be nugatory. And OCGA § 9-6-26 says that "[m]andamus will not be granted when it is manifest that the writ would, for any cause, be nugatory or fruitless[.]" See, e.g., *Halpern Properties v. Newton County Bd. of Equalization*, 245 Ga. 728, 728 (267 SE2d 26) (1980) (upholding the denial of mandamus to compel a member of a tax equalization board to indicate his vote on a tax assessment as

required by law, because the other two members had voted to approve the tax assessment so requiring the errant member to indicate his vote would be "a futile exercise").

It might be argued that holding an election for the non-existent next term of a Justice who vacated his office, even if its result would be legally meaningless, could produce some political or other abstract benefit for the candidate who wins, such as influencing the Governor to appoint the winning candidate to fill the vacancy or increasing the candidate's name recognition for a future election. There would be more obvious practical detriment from holding such an election, including the costs to taxpayers and the burden on election officials of conducting a legally meaningless election, and the likelihood that voters and the public would be misled into believing that the election's result would have the legally binding result that elections normally have.

But these policy considerations are beside the point, because mandamus is concerned with the *legal* effect of compelling official conduct. Thus, in *Halpern Properties*, this Court did not consider

whether a vote by the errant board member might have had some sort of political or other extra-legal effect on that member, on the votes of his fellow members, or on the public; instead, because the valid votes of the two members meant as a matter of law that the tax assessment was approved, the vote of the remaining member, notwithstanding his failure to fulfill his legal duty to indicate it, was *legally* nugatory and could not be compelled by mandamus.

This principle has been stated with greater clarity by other courts that follow the common-law principles of mandamus. In *Hall v. Staunton*, 47 SE 265 (W. Va. 1904), for example, the West Virginia Supreme Court explained that in determining whether mandamus would be "unavailing, fruitless, and nugatory," the question is, "Will the mandamus avail any *useful legal purpose* for [the petitioner]?" because "[a] mere abstract right, unattended by any substantial benefit to the [petitioner], will not be enforced by mandamus." Id. at 265-266 (citation and punctuation omitted; emphasis added). In subsequent cases, that court has applied this rule to situations where the petitioner sought to compel actions involving elections

that would have no effect on the legal consequence of the election:

> The personal satisfaction to a candidate of knowing he received a certain number of votes, or that a certain ballot was counted for him, is not a substantial right. It is mere abstract right. For the vindication of such a right mandamus does not lie. . . . It is settled in this State, and generally, we think, that mandamus will not lie when the thing or things sought would be unnecessary, fruitless, unavailing or nugatory; that the court will not compel the doing of a vain thing simply to enforce a mere abstract right unattended by any substantial benefits to the relator. *Hall v. Staunton*, [supra]. This principle was applied in *Ice v. Board of Canvassers* [*of Marion County*, 64 SE2d 331, 331 (W. Va. 1908)], an election case, like this, where we held that mandamus would not lie to enforce such a mere abstract right in order to satisfy the pride or ambition of the petitioner.

*Hatfield v. Logan County Court*, 167 SE 618, 619 (W. Va. 1933) (citations and punctuation omitted). Cf. *Mahoney v. Bd. of Supervisors of Elections of Queen Anne's County*, 108 A2d 143, 147 (Md. Ct. App. 1954) (explaining that "this Court has consistently held that a writ of mandamus should not be issued to demand an abstract right which would be unaccompanied by any substantial benefit," but that mandamus could lie to compel the counting of ballots that could change the result of an election). Neither Barrow

nor Beskin cites any contrary authority.[17]

For these reasons, mandamus cannot be granted to compel the Secretary of State to conduct an election to fill the future term of office of a Justice whose office will definitely be vacated before his existing term of office ends, thereby eliminating the future term.

4. *These cases turn on whether Justice Blackwell's prospective resignation, once accepted by the Governor, may be withdrawn, and we conclude that Georgia law does not allow such a withdrawal.*
    (a) *Justice Blackwell's office is not yet vacant.*
    The application of the legal principles set forth in the previous

---

[17] The dissent cites one other West Virginia case, *State ex rel. Revercomb v. Sizemore*, 22 SE2d 296 (W. Va. 1942), but that decision did not purport to change the principle that a grant of mandamus must have a legal effect, not merely an abstract or political benefit, to not be nugatory; the case turned on what sort of pleading was required in the context of a statewide election with recounts pending in several counties. See id. at 298-299. The dissent also suggests that the winner of an election has a property interest in the office to which he or she has been elected, which cannot be taken without due process, citing *Collins v. Morris*, 263 Ga. 734 (438 SE2d 896) (1994), and similar cases. As *Collins* explains, however, a property interest inheres only in "an elected . . . official *who is entitled to hold office under state law*." 263 Ga. at 735 (citation and punctuation omitted; emphasis added). See also *Eaves v. Harris*, 258 Ga. 1, 3 (364 SE2d 854) (1988) ("'[A]n official takes his office subject to the conditions imposed by the terms and nature of the political system in which he operates.'" (citation omitted)). The cases the dissent cites all involved efforts to remove elected officials who had already taken office, not any question about the validity of their elections. And as we have explained, under our State's current Constitution, an election for the next term of a Justice who has vacated his office is an election for a term of office that will never legally exist; our law creates no entitlement to fill or hold office for such a non-existent term, and thus creates no property interest in the "winner" of such an election.

division to the stipulated facts of these cases is straightforward in all but one respect. After serving an initial term of office of about 18 months after his appointment in July 2012, Justice Blackwell was elected in May 2014 to a standard six-year term of office beginning on January 1, 2015, and ending on December 31, 2020. The next election for his office would be the nonpartisan general election on May 19, 2020, with candidate qualifying beginning on March 2 and ending on March 6; that election would fill the next standard term in Justice Blackwell's office, which would start on January 1, 2021, and end on December 31, 2026.

On February 26, 2020, however, Justice Blackwell formally tendered his unequivocal, written resignation from the Supreme Court, effective November 18, 2020, and on the same day, the Governor unequivocally accepted that resignation effective November 18. Justice Blackwell is continuing to serve as a Justice, performing all the duties and functions pertaining to that office. In the trial court, the Secretary relied on OCGA § 45-5-1 (a) (2) to argue that Justice Blackwell's office immediately became "vacated" when

his resignation letter was accepted by the Governor; the trial court agreed and ultimately denied Barrow's and Beskin's mandamus petitions on that ground. But the Secretary does not repeat his immediate-vacancy argument on appeal, as that argument is clearly incorrect given this Court's interpretation of the term "vacancy" as used in Paragraph III of the judicial selection section of the 1983 Constitution. Justice Blackwell's office is conspicuously *not* "without an incumbent," *Clark*, 298 Ga. at 896, but instead "'is supplied, in the manner provided by the constitution or law, with an incumbent who is legally qualified to exercise the powers and perform the duties which pertain to it.'" *Pittman*, 184 Ga. at 256-257 (citation omitted). See also *Carey Canada, Inc. v. Hinely*, 181 Ga. App. 364, 365 (352 SE2d 398) (1986) (holding that a state court judge lawfully continued to serve in that office when he entered the order at issue, notwithstanding his resignation effective the next day, when he would take office as an elected superior court judge), reversed on other grounds, 257 Ga. 150 (356 SE2d 202) (1987).

OCGA § 45-5-1 could not alter the meaning of the

constitutional term "vacancy" as used in Paragraph III, see *Clark*, 298 Ga. at 897, and the Secretary now acknowledges that the statute sets forth *how* an office can be vacated (e.g., "*by* resignation, when accepted") but not necessarily *when* the vacancy arises (which the Secretary now contends will be when Justice Blackwell's resignation, accepted by the Governor, becomes effective on November 18).[18] Likewise, it is clear that the Governor's appointment of a Justice to fill a vacancy cannot become effective until the office is actually vacated. See OCGA § 45-5-1 (b) ("*Upon the occurrence of a vacancy* in any office in the state, the officer or body authorized to fill the vacancy or call for an election to fill the vacancy shall do so without the necessity of a judicial determination of the

---

[18] In concluding that Justice Blackwell's office was already vacant, the trial court found "persuasive" an unofficial Attorney General opinion issued in 1999 that said, "[W]ith the offer and acceptance of the resignation . . . , the incumbent's office has become vacant as a matter of law . . . notwithstanding the fact that the incumbent will continue to lawfully, physically occupy the office and exercise its duties and responsibilities until [the effective date of the resignation]." 1999 Op. Atty. Gen. U99-8, 1999 WL 1027240, at *1. That conclusion was poorly reasoned and is inconsistent with our holding in *Clark*, although the opinion's conclusion that "[o]nce [a] resignation is accepted, even if the effective date of the resignation is in the future, it is final and cannot be withdrawn," id., is in line with our holding below.

occurrence of the vacancy. . . ." (emphasis added)); *Patten v. Miller*, 190 Ga. 123, 142 (8 SE2d 757) (1940) ("There must be a vacancy before the power or duty of filling it arises.").

So the question becomes whether Justice Blackwell's office will *actually* be vacated before the end of his existing term, and that indeed is the question on which these cases turn. Under the principles discussed above, if Justice Blackwell's office will *inevitably* be vacated on or before November 18, then the Secretary's decision to cancel the May 19 election for the next term of Justice Blackwell's office is not subject to reversal by mandamus.[19] If the office is vacated before December 31, 2020, Justice Blackwell's current term will go with him. The Governor will then have the duty to appoint a Justice to fill the office, and the appointed Justice's term of office will not be measured by Justice Blackwell's current or future terms, but rather will start on the day the new Justice takes office and will continue until January 1 of the year following the next

---

[19] We say "on or before," because it is always possible that Justice Blackwell's office could be vacated in one of the other ways enumerated in OCGA § 45-5-1 (a).

nonpartisan general election at least six months later — meaning that it will end on December 31, 2022. So an election held on May 19, 2020 for a term of office that will never come to exist would be legally nugatory, and the Secretary could not be compelled by mandamus to conduct it.

On the other hand, however, if Justice Blackwell's resignation, notwithstanding its acceptance by the Governor, could be lawfully withdrawn before Justice Blackwell actually vacates his office, then no matter how likely it may be that the resignation becomes effective on November 18, there would be no certainty that his office would be vacant before December 31 — that is, there would be a chance that he *might* complete his existing term — and the Secretary would be required to conduct a nonpartisan election this year to fill the next standard term in the office beginning on January 1, 2021.

Thus, these cases boil down to whether, under Georgia law, a Justice's "prospective" resignation, tendered unequivocally in writing but effective only as of a future date, may be withdrawn after the Governor has formally and unequivocally accepted it as effective

on that same date. This Court has not directly addressed this question before, but for the several reasons that follow, we conclude that such a resignation cannot be lawfully revoked, even if both the Justice and the Governor consent to its purported withdrawal before its effective date.

(b) *All existing Georgia law indicates that a Justice's resignation, once accepted, cannot be lawfully withdrawn.*[20]

The common law of England as of 1776 forms the backdrop of Georgia law. See *Lathrop v. Deal*, 301 Ga. 408, 411-412 & n.9 (801 SE2d 867) (2017) ("In 1784, our General Assembly adopted the statutes and common law of England as of May 14, 1776, except to the extent that they were displaced by our own constitutional or statutory law. That adoption . . . remains in force today. See OCGA § 1-1-10 (c) (1)." (citation omitted)). At common law, both an official's tendering of his resignation *and* its acceptance by the proper authority was required to effectuate the resignation, because

---

[20] We note that the following discussion deals only with elected and appointed public officials, not all public employees and particularly not those persons whose work for a government is based on a contract.

holding public office

> was regarded as a burden which the appointee was bound,
> in the interest of the community and of good government,
> to bear. And from this it followed of course that, after an
> office was conferred and assumed, it could not be laid
> down without the consent of the appointing power.

*Edwards v. United States*, 103 U.S. 471, 473-474 (26 LE 314) (1880).

See also Floyd R. Mechem, Treatise on the Law of Public Offices and

Officers § 414 (1890) ("At common law, the resignation of a public

officer was not complete, so far as the public is concerned, until it

was duly accepted by the proper authorities.") ("Mechem").[21] Georgia

codified this common-law rule on resignations 160 years ago, see Ga.

Code of 1860, § 131 (2), and it has remained in our statutes ever

since; as noted above, it is currently found in OCGA § 45-5-1 (a) (2),

which says that "[a]ll offices in the state shall be vacated . . . [b]y

resignation, when accepted[.]"

---

[21] A refusal to accept a tendered resignation would not necessarily preclude a vacancy in the official's office until the end of his term. The official could abandon his office or cease to perform its duties, which is a distinct means of creating a vacancy under Georgia law. See OCGA § 45-5-1 (a) (7); *Parkerson v. Hart*, 200 Ga. 660, 663-664 (38 SE2d 397) (1946) (applying a previous version of this statutory provision).

When a resignation is intended to take effect immediately upon its acceptance and the two acts closely coincide, no issue of withdrawal arises. But resignations and their acceptance may also be prospective — i.e., effective as of a specific future date — which has long been common practice in Georgia and beyond. See, e.g., *Carey Canada, Inc.*, 181 Ga. App. at 365; *Hornsby,* 2002 U. S. Dist. LEXIS 27508, at *2. See also *Duncan v. Poythress*, 657 F2d 691, 693-695 (5th Cir. Unit B 1981) (analyzing whether a Justice's resignation, which was tendered and accepted effective as of the last day of the term he was serving and the day before the term to which he had been elected just before tendering the resignation, was intended to resign from both terms or only the ongoing one). Cf. *Partain v. Maddox*, 227 Ga. 623, 625, 632-633 (182 SE2d 450) (1971) (holding that an undated letter of resignation demanded by the Governor before the official's appointment to a term of office was invalid). This leads to the question of whether a prospective resignation, once accepted, may be lawfully withdrawn before the officer actually vacates his office.

We have found no expression of the common-law rule on resignations that mentions the prerogative of an official to withdraw his resignation after its acceptance, either unilaterally or with the consent of the accepting authority. Nor has withdrawal ever been included in or alluded to by the text of the Georgia statute on vacancies. OCGA § 45-5-1 (a) (2) says simply that a "resignation, when accepted," is sufficient to vacate an office.

There is Georgia precedent for the proposition that a public official may withdraw his resignation *before* it is properly accepted, because the resignation cannot be effective before that point. See *Henry County Bd. of Registrars v. Farmer*, 213 Ga. App. 522, 522 (444 SE2d 877) (1994). But that case does not suggest that the result might be the same *after* a resignation is accepted. And the only decision of this Court that appears to touch on this issue indicates that an accepted resignation by a Justice would be irrevocable. In *Smith v. Miller*, 261 Ga. 560 (407 SE2d 727) (1991), the Court noted, with a citation to OCGA § 45-5-1 (a), that it had temporarily enjoined the Governor from accepting the resignations of the

appellants (a Justice and a Court of Appeals judge), apparently to prevent the merits of their appeal from becoming moot. See id. at 560 & n.1, 564 n.3. Such an injunction would have been unnecessary if the resignations could be withdrawn even after acceptance.[22]

Because there is no indication in Georgia law, or in the old English common law that undergirds our law, that a public official's accepted resignation may be withdrawn, the burden is on Barrow and Beskin to demonstrate why we should adopt such a doctrine.[23]

---

[22] We note that in *Duncan*, the federal appellate court said the following in the course of discussing the district court's extensive findings of fact regarding whether Justice Bowles's November 1980 accepted resignation was intended to vacate both his existing term of office and the next term to which he had just been elected, which began on January 1, 1981:

> [T]he district court found that Justice Bowles did not intend to rescind his resignation by taking the oath of office for the upcoming term on December 15, 1980, and by briefly entering upon the duties of that office on January 5, 1981. Very little evidence was presented to indicate that Justice Bowles intended to rescind his earlier withdrawal, or that the governor consented to that rescission.

657 F2d at 694. This discussion pertained to Justice Bowles's subjective intent when he submitted his resignation in November. See id. at 695. To the extent the quoted passage could be read to suggest that Georgia law permits rescission of an accepted resignation, the court cited no legal authority for that proposition, from Georgia or anywhere else, and in any event the federal court's unsupported view of our State's law has no precedential effect. See footnote 27 below.

[23] In our expedited briefing order, we specifically directed the parties to address the withdrawal issue.

Beskin does not seek to do that; instead, in her principal brief, she argues that a Justice's resignation, accepted by the Governor, cannot be withdrawn. And Barrow offers little support for the contrary position, arguing primarily that we need not decide this issue because Justice Blackwell's accepted resignation has not yet taken effect. But as demonstrated above, whether his accepted resignation *definitely will* or *merely may* create a vacancy in his office before his current term ends is the issue upon which these cases turn.

(c) *The law of other jurisdictions is not consistent, but the better-reasoned cases do not allow accepted resignations to be withdrawn.*

We have also looked beyond Georgia law to see if there is a consensus view across the country that could convince us that accepted resignations may be withdrawn. There is not. We note first that some states have abandoned the common-law resignation rule by allowing public officials to resign unilaterally, without the need for acceptance. See, e.g., *Meeker v. Reed*, 232 P 760, 762 (Cal. Ct. App. 1924); *State ex rel. Ryan v. Murphy*, 97 P 391, 394 (Nev. 1908).

In most (but not all) of those states, the official also may unilaterally withdraw a prospective resignation before it takes effect. See, e.g., *Murphy*, 97 P at 395-396; *People v. Porter*, 6 Cal. 26, 28 (1856). Compare *People v. Kerner*, 167 NE2d 555, 558 (Ill. 1960) (reasoning that because a resignation need not be accepted to take effect, it is irrevocable when tendered, even if it will not take effect until a future date). The law of these states sheds little light on the law of a state like ours that adheres to the basic common-law resignation rule.

Looking then to the states that continue to follow the common-law rule with respect to resignations creating a vacancy only upon proper acceptance, some courts allow prospective resignations to be withdrawn by mutual consent of the official and the accepting authority. See, e.g., *Saunders v. O'Bannon*, 87 SW 1105, 1106 (Ky. 1905); *State ex rel. Van Buskirk v. Boecker*, 56 Mo. 17, 18-19 (Mo. 1874); *Biddle v. Willard*, 10 Ind. 62, 66-67 (Ind. 1857). But these opinions do not appear to be rooted in the English common law; we have found in none of them a common-law case cited in support of

the holding (one of the leading cases of this sort, *Biddle*, cites no law at all for its holding).[24] And even in these states, the authority to withdraw an accepted resignation is limited: if an appointee to the office that is expected to be vacated has been named, the appointee is said to have acquired "intervening rights" that preclude the resigning official and the accepting authority from thereafter agreeing to withdraw the resignation. See, e.g., *Saunders*, 87 SW at 1106; *Boecker*, 56 Mo. at 18-19; *Biddle*, 10 Ind. at 67. See also Mechem, supra, at § 133 ("A prospective appointment to fill an anticipated vacancy in a public office . . . is, in the absence of express law forbidding it, a legal appointment, and vests title to the office in the appointee.").

Many states that still follow the common-law rule requiring resignations to be accepted have followed a different path. Their

---

[24] The language on withdrawal of resignations that the dissent quotes from § 417 of Mechem's treatise is simply a quotation from *Biddle*, which as noted, cites no authority. Unlike the propositions for which we have cited that treatise, Mechem does not purport to be reciting the common-law rule on this point. Moreover, Mechem goes on in the same section to say, much more equivocally, "So certainly an accepted resignation can not be withdrawn, unless, perhaps, in those cases where the power to accept and the power to fill the vacancy are in the same officer or board."

courts hold that a public official's resignation, once accepted, is irrevocable, regardless of whether the resignation is immediate or prospective. See, e.g., *Fitzpatrick v. Welch*, 527 P2d 313, 314-315 (Idaho 1974); *Warner v. Selectmen of Amherst*, 95 NE2d 180, 183 (Mass. 1950); *Rogers v. Carleton*, 110 P2d 908, 909 (Okla. 1941); *Murray v. State*, 89 SW 101, 102 (Tenn. 1905). See also *Rider v. City of Batesville*, 245 SW2d 822, 823-824 (Ark. 1952) ("Although there is authority to the contrary, the preferable rule is stated in 67 C.J.S., Officers, § 55 f., as follows: 'If an acceptance is regarded as essential in order to render a resignation effective, an unconditional resignation to take effect at a future date may not be withdrawn after it has been accepted.'").

We find the reasoning of these decisions more consistent with the common-law resignation rule and far more persuasive than the reasoning of the contrary decisions. As discussed above, the common-law rule was based on the principle that a public official had a duty to serve until properly relieved of that duty by the acceptance of his resignation. Indeed, at common law, if an officer

refused to perform his duties, he was subject to penalties. See *Edwards*, 103 U.S. at 473, 476. Accordingly, certainty about when a tendered resignation would become effective was important to inform the official when he could leave office without liability, and the rule adopted was that the resignation was effective upon its proper acceptance. See id. at 476. Indeed, one of the leading cases for the proposition that a prospective resignation may be withdrawn by mutual consent acknowledged that "where the common-law rule is held to prevail, the right to withdraw after there has been an acceptance of the resignation has been denied." *Murphy*, 97 P at 393.

> In addition, these courts have recognized that

> [i]f . . . any . . . public officer were to be permitted once to indicate his lack of desire to hold an office and tender a resignation to be effective at some date in the future and then withdraw it, then logically he or any other person could do so a second, third, and fourth time ad infinitum. Such conduct could be destructive of the orderly conduct of governmental affairs, [and] the ability of an appointing authority to seek out and secure qualified persons to fill the purported vacancy[.]

*Fitzpatrick*, 527 P2d at 314-315. See also *Murray*, 89 SW at 102 ("[P]ublic interest requires that vacillation of purpose on the part of

the person resigning should not be encouraged, and the discretion of the accepting tribunal, when once exercised, should not be reconsidered.").[25]

(d) *Conclusion.*

After surveying this broader legal landscape, we see no compelling reason to judicially imply into Georgia law a right for a public official to withdraw an accepted resignation that has never been expressed in the common law, our resignation statute, or our case law. The decisions in other jurisdictions that reject withdrawal of accepted resignations appear to us better reasoned and more consistent with the basic common-law resignation rule. That is enough to decide this issue, although we also recognize that the contrary view can produce serious practical problems, with little real benefit, as illustrated by the situation before us.

If Justice Blackwell's resignation, despite its acceptance by the

---

[25] In attempted rebuttal of this point, the dissent quotes the Nevada Supreme Court's discussion in *Murphy* of the "public policy" regarding withdrawal of resignations. But that is the view of a court that leaves resignation wholly in the discretion of the public official, rejecting the common-law rule requiring resignations to be accepted.

Governor, could be withdrawn before Justice Blackwell actually leaves his office on November 18, it would require that the May 19 election for his office be conducted — only to have the result of that election rendered legally meaningless if the resignation occurs as planned. Indeed, Justice Blackwell could have simply waited, allowed the May 19 election for the next term of his office to go forward (with or without him as a candidate), and then tendered his resignation on November 18, had it promptly accepted by the Governor, and departed his office that same day. If that had happened, as discussed in Division 3 above, there would be no doubt that Justice Blackwell's office was vacant on November 18, that his term of office expiring on December 31 was eliminated, that the Governor was empowered to appoint a successor whose initial term of office would run until January 1, 2023, and that whoever won the May 19 election would have won nothing of legal value, as he or she would have no term of office to fill.

By tendering his prospective resignation *before* the qualifying period for the election (and having it accepted by the Governor),

Justice Blackwell put the Secretary of State, potential candidates, voters, and the public on notice that his office will be vacated at a time that will make the election legally meaningless; by so doing, he also precluded criticism that he was basing the timing of his resignation on who won or lost the election. The beneficial consequences of the approach taken by Justice Blackwell would be unavailable under a doctrine that allowed withdrawal of accepted resignations. Instead, an accepted prospective resignation effective after the election date would produce uncertainty about whether the election would have any legal effect and accusations that the resignation was announced to deter some or all candidates from qualifying for the election.

Judicially creating a withdrawal-by-mutual-consent doctrine would also shift more power over resignations to the Governor, who would effectively be able to decide whether an official who has second thoughts about resigning is allowed to remain in office. Our opinions cannot give Governors more authority over resignations than is constitutionally and statutorily prescribed. See, e.g.,

*Partain*, 227 Ga. at 632; *Patten*, 190 Ga. at 142-143.

Indeed, even the courts that allow withdrawal of an accepted resignation by mutual consent appear to agree uniformly that the opportunity for such withdrawal ends when an appointee to the office to be vacated is named, so our adopting a similar withdrawal-by-mutual-consent doctrine would empower the Governor by allowing him to decide when that opportunity ends. A ruling of this sort would have us hold that the Secretary could be commanded by mandamus to conduct the May 19 election for the next standard term of Justice Blackwell's office — but only until the Governor names an appointee to fill the vacancy in that office that is expected to occur on November 18 based on Justice Blackwell's accepted resignation, at which point the resignation would become irrevocable. If we issued such a judgment, Governor Kemp could then promptly name an appointee, at which point the election would become nugatory and the Secretary could again cancel it. Placing this additional power in the hands of the Governor is not something that either Barrow or Beskin seeks, and we see no good reason to do

so.[26]

For all of these reasons, we will follow the direction in which all of Georgia's existing legal authorities point and the better-reasoned cases from other jurisdictions support. We hold that after a Justice's unequivocal resignation from office is unequivocally accepted by the Governor, it cannot be lawfully withdrawn, regardless of whether the accepted resignation has an immediate or

---

[26] This is not to say that the Governor is precluded in any way from going ahead with the process of selecting and appointing the person who will fill Justice Blackwell's office after it is vacated on November 18. As Barrow and Beskin correctly argue and the Secretary acknowledges, however, such an appointment would not become effective and the appointee could not fill the office until the vacancy actually exists. See *Murphy v. Pearson*, 284 Ga. 296, 297 (667 SE2d 83) (2008) ("As a general rule, an appointing authority may make a prospective appointment, that is, an appointment that fills a prospective vacancy before the vacancy occurs."). See also Mechem, supra, § 133 ("A prospective appointment to fill an anticipated vacancy in a public office, made by the person or body which, as then constituted, is empowered to fill the vacancy when it arises, is, in the absence of express law forbidding it, a legal appointment . . . . Thus where a public officer resigns his office to take effect at a future day, and his resignation is accepted, the appointing power being, as then organized, authorized to fill the vacancy when it shall occur, may appoint a successor, the appointment to take effect when the resignation becomes operative." (emphasis omitted)). Indeed, as discussed above, the rule that a prospective resignation, once accepted, is irrevocable allows appointing authorities like the Governor to go ahead with the process of appointing a successor so that the vacancy may be filled when or shortly after it occurs, and with persons interested in the appointment having confidence that the vacancy will actually arise.

prospective effective date.

5. *Beskin's federal claims also fail.*

To be entitled to relief under 42 USC § 1983, a plaintiff must show that she has been deprived of a right secured by the Constitution and laws of the United States, and that the defendant acted under color of state law. See *Poss v. Moreland*, 253 Ga. 730, 731 (324 SE2d 456) (1985). As Beskin acknowledges, her federal claims are wholly derivative of the state-law issues underlying her mandamus claim. State law governs whether and how state judicial officers are elected, see *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 437 (135 SCt 1656, 191 LE2d 570) (2015), and the federal due process right she asserts protects against "the disenfranchisement of a state electorate *in violation of state election law.*" *Duncan*, 657 F2d at 708 (emphasis added). Accordingly, because we have concluded that the Secretary did not violate Georgia election law by canceling the May 19 election for Justice Blackwell's office, Beskin has failed to state a claim under 42 USC § 1983. See *Duncan*, 657 F2d at 697-698 ("The district court recognized that if the Georgia courts should interpret

the state's election laws in a manner that validated the appointment of Justice Bowles's successor, then no reason would exist for the federal courts to decide whether an illegal denial of a special election violates the United States Constitution."). See also *Hornsby*, 2002 U.S. Dist. LEXIS 27508, at *9-10. And because Beskin is not the "prevailing party" in her case, she is not entitled to litigation costs and attorney fees under 42 USC § 1988 (b).[27]

---

[27] Barrow, Beskin, and the amici suggest that claims like the ones brought in these cases may also be pursued in the federal courts. That may be, but as to the interpretation of the Georgia Constitution and Georgia election law, the decisions of this Court are conclusive, and the federal courts are bound by them. See *Mullaney v. Wilbur*, 421 U.S. 684, 691 (95 SCt 1881, 44 LE2d 508) (1975) ("This Court . . . repeatedly has held that state courts are the ultimate expositors of state law . . . and that we are bound by their constructions except in extreme circumstances[.]"). See also *Riley v. Kennedy*, 553 U.S. 406, 425 (128 SCt 1970, 170 LE2d 837) (2008) (quoting *Mullaney* in the context of an election law issue for the proposition that "[a] State's highest court is unquestionably 'the ultimate exposito(r) of state law'"); *In re Cassell*, 688 F3d 1291, 1292 (11th Cir. 2012) ("[T]he Georgia Supreme Court . . . is the one true and final arbiter of Georgia law."); *Elliott v. State*, 305 Ga. 179, 202 (824 SE2d 265) (2019) ("It is the role of this Court, not the United States Supreme Court, other states' courts, or courts of foreign countries, to construe the meaning of the Georgia Constitution in the light of its particular language, history, and context."). As a judge of the United States Court of Appeals for the Eleventh Circuit once explained in arguing that a state law question should be certified to this Court:

> From our perspective, state law is what the state supreme court says it is, and a state supreme court's pronouncements on the subject are binding on every state and federal judge. By contrast, when we write to a state law issue, we write in faint and disappearing ink: what we write does not bind any state court

6. *Conclusion.*

Barrow, Beskin, and the amici complain about aspects of our State's constitutional system for selecting Supreme Court Justices as we have construed and applied that law in this opinion and our prior precedents. They (and the dissent) condemn in particular the idea that a Justice can resign late in his term of office, resulting in his successor being selected by gubernatorial appointment rather than election. But as shown above, under our current constitutional system, elections for the next term of an incumbent Justice's office are not made meaningless only by a late-in-term resignation, but rather by a vacancy arising *at any time* during an incumbent's term.

It also should be recognized that this is the first time in the more than three decades that we have lived under our current Constitution that an incumbent Justice's office will be vacated after the time an election would have been held for the next term of his

---

judge, and even as to the federal judges in this Circuit, once the state supreme court speaks the effect of anything we have written vanishes like the proverbial bat in daylight, only faster. *Sultenfuss v. Snow*, 35 F3d 1494, 1504 (11th Cir. 1994) (Carnes, J., dissenting).

office, which is the same number of times that an incumbent Justice (Carol W. Hunstein) has completed a term so that the election for the next term of her office was not eliminated. Only occasionally have Justices resigned in the final year of their terms; more common are resignations earlier in terms, resulting in elections for standard terms of the appointed successors' offices at the same time as the elections would have been held for the resigned Justices' next terms.

As is true of all judicial selection procedures, there are reasonable arguments against Georgia's system, but also good arguments for it. Those policy arguments are beside the point, however, with regard to how these cases should be decided, because that debate was resolved by the people of Georgia when they ratified their Constitution with this new system in 1983. This Court has no authority to alter that resolution because of the parties' (or our own) policy preferences. The same conclusion pertains here as in *Palmour* and *Clark*:

> [T]his case is not resolved by a subjective opinion of how extensive the power of the [G]overnor should be in regard to appointments to elective office. It is determined by the

> unambiguous mandate of the constitution as ratified by the voters of Georgia. It is about implementing the last expression of the sovereign will of the people, in this case, the Governor's power to fill vacancies under Article VI, Section VII, Paragraph III of the 1983 Georgia Constitution.

*Clark*, 298 Ga. at 899 (quoting *Palmour*, 278 Ga. at 221) (punctuation omitted). See also *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("Suffice it to say, it is not the role of a judge to 'interpret' constitutional or statutory provisions through the prism of his or her own personal policy preferences."). To the extent that the judicial selection system is subject to the possibility of manipulation by the relevant officials (as almost all government systems are), the checks against such machinations come in forms other than courts altering the Constitution by judicial fiat, including the selection of Justices with integrity, the political risks to Governors who make poor appointments, and of course the ultimate authority of the people of Georgia to change the Constitution that governs them.

For the reasons discussed above, the trial court reached the

right result in denying Barrow's and Beskin's petitions for mandamus and Beskin's federal claims, and those judgments are therefore affirmed.

*Judgment affirmed. Melton, C. J., Warren, J., and Judges Richard M. Cowart, Sarah F. Wall, and Timothy R. Walmsley concur. Judges Scott L. Ballard and Brenda Holbert Trammell dissent. Blackwell, Boggs, Peterson, Bethel, Ellington, and McMillian, JJ., not participating.*

MELTON, Chief Justice, concurring.

Although I concur fully in everything that is said in the majority opinion, I write separately to emphasize that this case is not about this Court's choice between elections and appointments. To the contrary, this case is about applying the language of Georgia's Constitution and corresponding statutory law to determine whether Governor Kemp may appoint a new Justice to this Court following a vacancy in Justice Blackwell's office or whether an election must be held. Because the merits of appointments and elections *have already been weighed* by the people of Georgia when they ratified the Georgia Constitution of 1983 and by the General Assembly when it enacted laws regulating the orderly transition of Justices onto and off of the Supreme Court of Georgia, our job as judges is limited to applying the law the people of Georgia and their elected representatives have provided to us.

Doing so, it becomes clear that, by mandate of constitutional and statutory law as outlined in the majority opinion, the Governor has the authority to appoint a new Justice to the Court based on the

facts presented in this case. Justice Blackwell's written letter of resignation has been both tendered to Governor Kemp and accepted by him. We have held today that, under Georgia law, this makes Justice Blackwell's resignation bilaterally irrevocable, ensuring that, on November 18, 2020, Justice Blackwell's office will, in fact and certainty, become vacant. And, at the instant that Justice Blackwell vacates his office, the terms of office particularly associated with Justice Blackwell — his current one based on his 2014 election and any future terms — *cease to exist*. After November 18, 2020, there can be no elected successor to Justice Blackwell's next term of office because that term will have vanished.

In more illustrative language, one might think of Justice Blackwell's term as his carrying the torch handed to him on the day he took office at this Court. When Justice Blackwell vacates his office on November 18, 2020, he will not be handing that torch to a successor Justice, either elected or appointed. Instead, Justice Blackwell will be handing that torch to the Governor, at which time it will be immediately extinguished. No one, even if elected to do so

at a prior time, could carry Justice Blackwell's torch after he vacates office, because that torch is neither burning nor extant. Instead, by appointment, the Governor must light a wholly new torch and hand it to a new Justice. This is simply the manner in which the law works when we apply the relevant constitutional provisions ratified by the people of Georgia to the facts of this case.

While I recognize that this matter has prompted a great deal of public debate regarding the merits and demerits of judicial appointments and elections (and will likely continue to do so), the existing law which this Court must apply to the present controversy is clear: the Governor has the constitutional authority to appoint a new Justice to this Court in response to the vacancy created by Justice Blackwell's resignation. The genius of our democracy is that, to the extent the people of Georgia now second-guess the system of elections and appointments they ratified in the 1983 Constitution, they have the power to seek amendment to that foundational document. But it is not the job of judges to usurp that power by rewriting constitutional provisions ratified by the people, or by

rewriting laws enacted by the people's democratically elected representatives.

I am authorized to state that Justice Warren and Judges Cowart and Walmsley join in this concurrence.

TRAMMELL, Judge, dissenting.

I agree with much of the majority opinion. I agree that this Court has jurisdiction over this election contest. I also agree that there is not currently a vacancy on the Court that would authorize a gubernatorial appointment for Justice Blackwell's seat. The majority is correct regarding the Governor's duty to appoint an individual to fill a vacancy on this Court and the effect of any such appointment. However, because an appointment is unlawful in this circumstance, I must respectfully dissent.

We must reconcile two constitutional provisions. One guarantees the rights of the voters to determine the next Justice of the Supreme Court of Georgia. The other grants to the Governor the right to fill vacancies in such office by appointment. In most circumstances, the determination is fairly obvious. In this one, however, there is a direct conflict between the constitutional provisions requiring election and those providing for appointment. The majority gives the greater weight to the provisions allowing appointment. Because I feel that this denies the

people the right to elect their Justice as provided by the Constitution, I cannot agree with the majority position.

The majority asserts, without disagreement, that the appointment process for vacancies and elections have equal constitutional status and work in tandem. However, the majority misses a major point. The power of appointment is an *exception* to the general rule requiring that Justices be elected. Appointment is, in fact, "constitutionally inferior." The majority seems to indicate that the provisions regarding appointment prevail over the more general provisions regarding election. That is contrary to both the Constitution and prior case authority.

> OCGA § 21-2-9 (b): Justices of the Supreme Court, . . . *shall* be elected in the nonpartisan general election next preceding the expiration of the term of office. (emphasis added).

> Ga. Const. of 1983, Art. VI, Sec. VII, Par. I: . . . All Justices of the Supreme Court and the Judges of the Court of Appeals *shall* be elected on a nonpartisan basis for a term of six years. The terms of all judges thus elected *shall* begin the next January 1 after their election. . . . (emphasis added).

Without question, the constitutional provisions mandate elections be held. Prior cases from this Court support this view. They stress the importance of elections in the selection of Justices and specifically hold that the appointment process is for emergency situations.

> This power of executive appointment is for an emergency, and can be exercised only in case of a vacancy. It can not be exercised to be effective while a duly commissioned incumbent is in office. *Mitchell v. Pittman*, 184 Ga. 877, 885 (194 SE 369) (1937).

> The constitutional design to fill the offices of judges of the superior courts by vote of the qualified electors must be carried in mind. It is distinctive from executive function, and manifests a policy to select the judges by the electorate. This object should also be borne in mind. Id. at 884.

> It is well known to all of us that the primary object to be secured by the amendment of 1896 was to withdraw the elective power of the Justices from the General Assembly of the State and to lodge it with the sovereign people, and to increase the number of judges. *Stephens v. Reid*, 189 Ga. 372, 379 (6 SE2d 728) (1939).

> Additionally, the Court finds that certain provisions contained in the consent decree would violate Georgia statutory and constitutional law. A retention election system, such as the one set forth in the consent decree, cannot satisfy the present Georgia constitutional

requirement that judges be elected. *Brooks v. State Bd. of Elections*, 848 FSupp. 1548, 1577 (S.D. Ga. 1994).

The majority views the reference to *Brooks* by this dissent as curious, but it is undisputed that the *Brooks* Court recognized and enforced the right of the people of Georgia, consistent with the Constitution, to vote for their judiciary. Even while recognizing the majority of judges were elected, and rarely beaten in elections, the potential for that election had to be preserved.

> In reality, however, few incumbents are actually challenged in contested elections, and, of the few incumbents who are challenged, even fewer are defeated at the polls. Nevertheless, under the current system, qualified individuals can run against incumbent judges or justices in open elections and when that occurs, the voters choose who will serve them directly; the candidate having a majority of the votes in the election or the highest number of votes in a run-off wins.

Brooks, 848 FSupp.

> The people of the State of Georgia have, both individually and through their elected representatives, developed, codified, and ratified the current system of electing judges. Under the current system, the people have reserved for themselves the right, and the corresponding responsibility, to vote directly for their judicial candidates. See GA. CONST. Art. 6, § 7, ¶ 1 (1983); O.C.G.A. § 21-2-138 (1993). It is true that under the

current system there are relatively few contested judicial elections, but there is always the potential for one. Within this potential lies the power of choice. By removing this potential, the consent decree would remove from the people the power of direct choice and place that power in the Governor and the Judicial Nominating Committee. This potential is worthy of protection and indeed must be protected under the current Georgia Constitution at least until such time that the Georgia system is legally changed, declared unconstitutional or held to be violative of federal law.

Id. at 1567.

Interestingly, the majority acknowledges that appointment was an "exception" to the general policy of elections just a few short years ago. *Clark v. Deal*, 298 Ga. 893, 896 n.2 (785 SE2d 524) (2016). Elections for Supreme Court Justices have been guaranteed since the 1896 amendments to the 1877 Georgia Constitution, and the right to judicial elections was restated in the 1945, 1976 and 1983 Constitutions. In each of those Constitutions, the Governor was provided a power of appointment for vacancies. However, this is the first time that the Governor's power of appointment is now being held to be superior to the people's right to vote. That is ostensibly due to the language of the timing of the election for the vacated seat.

Justice Blackwell submitted his resignation on February 26, 2020. It was accepted by the Governor on the same date. Justice Blackwell indicated that his resignation would not be effective until November 18, 2020. We all agree that there is not a vacancy in that office authorizing an appointment by the Governor, and will not be until November 18, the date on which Justice Blackwell has indicated that he will vacate his current position. Under ordinary circumstances, it is without question that the appointee to that seat would have the right to remain in the seat without facing the voters at a general election at least six months after appointment. That is the balance between "democracy and stability" referenced in *Perdue v. Palmour*, 278 Ga. 217, 221 (600 SE2d 370) (2004), and *Heiskell v. Roberts*, 295 Ga. 795, 799 (764 SE2d 368) (2014), which quoted the Transcript of the Select Committee on Constitutional Revision and brings to light the intent of the drafters of our current state Constitution.

The difference that requires consideration presently is that Justice Blackwell's resignation will not become effective prior to the

regularly scheduled election of May 19 (now June 9). He intends to continue in his office through November 18, some nine months after his announced resignation, and six months after the regularly scheduled election for his replacement. The majority would cancel the scheduled election to allow the Governor to make an appointment that cannot be made until after the scheduled election. Why? The majority says that the winner would not be permitted to take office because of the anticipated appointment, so the election need not be held. For the first time since the enactment of this constitutional provision, the majority is ruling that the appointment power of the Governor trumps the voting power of the public. Let me be clear. This ruling means that even were the election to go forward and a winner be declared, the appointee defeats the electee.

Each of the constitutional provisions should be construed together to determine the appropriate outcome in this circumstance. While perhaps not subordinate (though the time of service for the appointment is well less than an election), the

provisions providing the right of appointment are *not* superior to the right of the electorate.

> Established rules of constitutional construction prohibit us from any interpretation that would render a word superfluous or meaningless. *Gwinnett County School Dist. v. Cox*, 289 Ga. 265, 271 (710 SE2d 773) (2011) (citing *Blum v. Schrader*, 281 Ga. 238, 241 (637 SE2d 396) (2006)).

The various provisions of the Constitution are not to be interpreted as contradictory, but rather are to be construed in harmony with one another. See *Lucas v. Woodward*, 240 Ga. 770, 774 (243 SE2d 28) (1978). Interpretation must not be literal or restricted if it will defeat the intention of the people. "It has been said that the letter of the law is its body; the spirit, its soul; and the construction of the former should never be so rigid and technical as to destroy the latter." *Dyer v. Dyer*, 194 SE 278, 280 (N.C. 1937), quoted in *Stephens*, 189 Ga. at 380.

The majority seems to argue that appointment is the norm, and therefore, the specific right of the Governor to appoint should take precedence over the general election requirements. The

majority notes that all but one of the 18 Justices who took office after the enactment of this constitutional provision were initially appointed by the Governor, the sole exception being Justice John J. Ellington. However, under the majority opinion, had something happened to Justice Carol W. Hunstein prior to December 31 of Justice Ellington's election year (such as death, resignation, or abandonment of her office), even though he was the only candidate in the race, even though the voters elected him in a state-wide race, and even though he had been declared the winner, Justice Ellington would not be a Justice on this Court. The majority opinion holds that the appointment provision would take precedence over the voting public, and the Governor's appointment would take the seat. That cannot be the intention of the drafters of our Constitution and was never envisioned nor mentioned by those serving on the Select Committee on Constitutional Revision.[28]

---

[28] In fact, in an interesting note in the Select Committee on Constitutional Revision, 1977-1981, Transcripts of Meetings, Committee to Revise Art. VI, Vol. I, meeting of Oct. 7, 1977, pp. 32-33, in discussing the Judicial Nominating Committee and who should make appointments thereto,

The concern by the Committee was how to provide for retention after appointment without requiring Justices to immediately run for election. The concern was the time between appointment and election, not a time period after election as set forth in *Heiskell*, 295 Ga. at 798-799.

> Thus, on one side of the coin, someone appointed to fill a vacancy occurring at the beginning of a six-year term will not be immune from voter consideration for that entire period; he would have to run in the next general election. On the other side of the coin, someone appointed *between June and November* of a general election year would not have to run immediately and would have a little over two years to demonstrate his qualifications as a judge. . . . This is a practical balance between democracy and stability.

(citation and punctuation omitted; emphasis added). (At the time of that decision, the elections for Justices were in November, not at the time of the primary as now.) Further review of the transcript reveals

---

Judge Smith said, "I go along with the idea of letting the Governor do the appointing. We've just about taken everything else he's got away from him; leave him something." So far from believing they had *increased* the authority of the Governor, at least this committee member believed it had been decreased.

the reasons for the six months provision in the vacancy. While it is true that the transcript language is not binding on the Court, it does shed light on the meaning for the enactment, which this Court is attempting to discern.

> "We interpret a constitutional provision according to the original public meaning of its text, which is simply shorthand for the meaning the people understood a provision to have at the time they enacted it." *Elliott v. State*, 305 Ga. 179, 189 (824 SE2d 265) (2019) (citation omitted).

> Original public meaning is an interpretive principle that we apply to each of our [C]onstitutions. . . . "[T]he Constitution, like every other instrument made by men, is to be construed in the sense in which it was understood by the makers of it at the time when they made it. To deny this is to insist that a fraud shall be perpetrated upon those makers or upon some of them." Id. at 182 (citation, punctuation and emphasis omitted).

The real issues were the payment of qualifying fees and having to run in more than one election. The September appointment and the subsequent election referenced in the transcript and in the majority note, was a date that, at the time, was *before, not after*, the date of the regularly scheduled election.

This is also clear from the language that after appointment *"you serve past* [the election]":

> JUDGE SMITH: Mr. Chairman, I don't know whether this is the place to do it or not, but if it isn't let's be sure we do it. Let's put it where the poor fellow doesn't have to pay two qualifying fees and run in two elections — all in six months of each other like I did last year. That's just unbelievable. I had to pay two qualifying fees and run three times.
> JUDGE SNOW: This is supposed to eliminate that.

> . . .

> JUDGE CALHOUN: No. He would serve two years and six months but he'd have to run — what we're trying to eliminate is that a man who — [s]uppose the term does expire on December 31st and somebody's appointed on September 1st.
> JUDGE SMITH: That's exactly what happened to me and I had to pay another qualifying fee in November and I was on the ballot in two places in November.
> MR. HIGHT: But this eliminates that because it says that *when he appoints you, you serve past* —

> . . .

> DEAN PATTERSON: One problem that might raise if you have a Judge appointed for a vacancy less than six months prior to the election and others qualified to run in that election —
> MR. DROLET: That eliminates that election.

> . . .

MR. HARRIS: As I recall, if you take six months after November, you get into May. Generally qualifying for primaries are up until May, closed in June.

MR. HODGKINS: I think another reason why we did it was people who take over terms sometimes have to qualify both for the remainder of the term and the new term and you've got a double qualifying fee and that type thing.

CHAIRMAN SNOW: This would prevent them from having to have two — run in two different elections at the time.

All the discussions, and the language quoted in prior Supreme Court cases, refer to the period between June and November, not afterward. November, at the time, was the month of election. There was no discussion of an appointment usurping the results of an election, and the conversations consistently upheld the sanctity of elections:

BOB STUBBS: I don't think there's any purpose on the part of anybody on the Committee to remove Judges from elections, I think we're all in accord on that.

Select Committee on Constitutional Revision, 1977-1981, Transcripts of Meetings, Committee to Revise Art. VI, Vol. II, meeting of Nov. 9, 1978, p. 47.

JUDGE CALHOUN: I agree with you that judges ought

to be elected and they will be elected under this. That's what we are trying to do.

Select Committee on Constitutional Revision, 1977-1981, Transcripts of Meetings, Committee to Revise Art. VI, Vol. III, meeting of June 27, 1980, p. 83.

In this case, there is a scheduled election prior to the date of Justice Blackwell's exit from office, during a period in which there is no lawful vacancy allowing appointment. A "successor" to Justice Blackwell would be elected by the voters in that election, who is constitutionally mandated (see "shall" language) to take office on the following January 1, before any appointment could be made.

There are no other cases in the State (or elsewhere) wherein a gubernatorial appointment has been made after an election has been held for the office. There have been those who have qualified for the race and been advised they could not run. See *Hornsby v. Barnes*, 2002 U. S. Dist. LEXIS 27508 (N.D. Ga. 2002). There are those that resigned a prior office to run for a race and were advised that an appointment would be made. See *Perdue*, 278 Ga. at 217. In all of those cases, the right of the Governor to make an appointment was upheld, but these were all *pre-election*.

The majority seems to think that this is a distinction without a difference. In the majority view, qualifying is all part of the election "process" which is secondary to the appointment power. However, the process does not equate to the election itself.

There has not been another case where an intervening election would be voided by an anticipated gubernatorial appointment. The majority opines that it is a foregone conclusion that the Governor's appointment would take precedence over any election that would be held. (The fact that the resignation was made prior to the election does not change the fact that there will be no vacancy until after the scheduled election since Justice Blackwell is not leaving his office until November, which is when a vacancy, by law, will be established.)

Based on the ruling that the appointment authority is absolute, the majority makes the final two determinations:

1.    Mandamus should not issue because whoever was elected would not be entitled to take the office; and

2.    Since Justice Blackwell has no right to withdraw his resignation, even with the consent of the Governor, there

is no need to hold the election for this office.

The majority first determines that unless there was a possibility of a withdrawal of the resignation, then mandamus cannot be granted because to do so would be a nugatory act. In support, cases from other jurisdictions are cited which denied mandamus for (mostly) voting recounts when the expected or alleged count would not affect the election results. The majority does note that there may be some political or other benefit from holding the election, but the cost and the danger of misleading the public into believing that their vote would make a difference were factors weighing against that benefit. (In this instance the primary has been postponed, and a general election is upcoming, so the cost is questionable.) But in the same types of cases, mandamus may be appropriate as the West Virginia Supreme Court held in *State ex rel. Revercomb v. Sizemore*, 22 SE2d 296 (W. Va. 1942):

> Respondents assert that without an allegation or a showing that the result of the election will be changed to the extent that relator will be deprived of the nomination sought that it would be a vain and futile thing to award the writ. We have held many times that such a showing

is necessary. This principle is firmly established by the cases cited, however, in each instance a county or district office was involved. We must recognize the futility, if not the impossibility, of attempting to make an allegation of the nature insisted upon by respondents where a state-wide election is involved, especially where, as in this case, the petition shows that recounts are pending in several counties. The distinction between a state-wide election and a county or district election must be recognized because it would be useless to insist upon an allegation which goes merely to the form and not to the substance of the matters sought to be established. Where fifty-five counties are involved and recounts pending, as in this case, how could relator successfully urge that he will lose the nomination unless he is given the relief sought by his petition? For the reasons assigned the writ, as prayed for, is awarded.

Id. at 298-299 (citations omitted). This is a case wherein mandamus is appropriate.

The Secretary of State has conceded that he cannot cancel an election based on an expected or highly likely vacancy in the office. Since there is no vacancy, previous declarations of this Court appear to indicate that an election is required.

The office under consideration in *Stephens v. Reid* was that of Chief Justice of the Supreme Court of Georgia. This court said: "As we have pointed out, *if no vacancy exists in the office of Chief Justice and the Associate Justices of this court, they are elected by the people at the*

*same time and in the same manner as the Governor and the statehouse officers are elected.*"

*Copland v. Wohlwender*, 197 Ga. 782, 788 (30 SE2d 462) (1944) (emphasis added).

It, therefore, appears that the law requires an election if there is no vacancy. And in this instance, we have all agreed there is no vacancy, and will not be until Justice Blackwell vacates his office.

A further consideration is that avoidance of an election disenfranchises voters and is violative of the constitutional provision requiring elections. *Duncan v. Poythress*, 515 FSupp. 327 (N.D. Ga. 1981), aff'd 657 F2d 691, found that the violation of that right entitled the deprived voters to sue for that deprivation:

> In this case, the plaintiffs contend that the defendants manipulated events to deprive them of their right, granted by the Constitution and laws of the state of Georgia, to vote to fill a vacancy on the Georgia Supreme Court. This court can conceive of no more fundamental flaw in the electoral process than the deprivation of the right to vote altogether. We conclude that, when evaluated in light of the appropriate legal standard, the plaintiffs' allegations state a claim for relief under section 1983.

Id. at 337.

But in determining whether the election would be a "nugatory act," the majority stresses that the question is whether the grant of mandamus will "avail any useful legal purpose for [the petitioner]?" And the answer in this case is yes. If the election were held, prior decisions of this Court provide that there is a property interest in the seat to which one has been elected which cannot be taken without due process. *Collins v. Morris*, 263 Ga. 734, 735 (438 SE2d 896) (1994). See also *Northway v. Allen*, 291 Ga. 227, 230 (728 SE2d 624) (2012); *City of Ludowici v. Stapleton*, 258 Ga. 868, 869 (375 SE2d 855) (1989). In *Eaves v. Harris*, 258 Ga. 1, 3 (364 SE2d 854) (1988), the official was held to have a constitutional right to hold the public office to which he had been duly elected, and that he could not be deprived of that right without due process.

When we harmonize the constitutional requirements and review the case authority, it appears that elections are required when there is no vacancy, and elected officials have a constitutional right to hold the office to which they have been elected. Therefore, it follows that the holding of an election would not be a nugatory act,

and that the appointment power must bow, *after election*, to the right of the voters to elect a successor to the office.

Consider the stark realities of what happens if the election of the people is denied in this instance.

A. A sitting judge determines he will not run again at the end of his term. An election is held, and a successor elected. The judge dies before the end of the term. The Governor then appoints a replacement, and the election is in essence voided. (This is what would have happened to Justice Ellington had Justice Hunstein not been in such great mental and physical health!)

B. The incumbent runs for election, loses, and then resigns, only to be re-appointed by the Governor.

C. The incumbent does not stand for election, an election is held, the incumbent does not like the result of the election and resigns to avoid the taking of the office by the elected official.

D. What would keep anyone from doing this in any time frame, effectively preventing any justice from being elected? Could one upon date of election say they were resigning on December 30, four years later, and effectively prevent any election being held?

E. What is the result if something happens and the Governor does not make an appointment? Again, while improbable, we are discussing the possibilities of this potential appointment, and not the probabilities. If the Governor did not appoint prior to December 31, when the

Constitution mandates that an elected official *shall* take office, what happens?

F. We have numerous persons that have qualified and are running for judgeships in the election presently scheduled for June 9. Should we have all of them wishing, hoping and praying for the health and safety of the jurist they hope to replace?

None of the cases that have been decided by this Court requires a different result. There is *no* case decided by this Court that allows an appointment to *void* a regularly scheduled and held election. All of the cases have been pre-election, even though some have been after the qualifying period. It is clear from these scenarios that no appointment should take priority over a regularly scheduled election by the people.

As an additional matter, I further disagree with the determination by the majority that the resignation of Justice Blackwell could not be rescinded by mutual agreement of the Governor and the Justice. We all agree that the resignation has been tendered and accepted and that it cannot be unilaterally withdrawn. However, while not binding or dispositive, language

in *Duncan* seems to indicate that it could be withdrawn by mutual consent: "Other than the acts specified, the defendants presented no evidence that Bowles intended to rescind his earlier withdrawal by taking the oath of office, or that the Governor consented to that rescission." 515 FSupp. at 341.

Other states have also held that a prospective resignation such as the one here can be withdrawn at any time before it is accepted, and, after it is accepted, it may be withdrawn with the consent of the authority, excepting where no new rights have intervened. See, e.g., *Civil Service Bd. v. Carter*, 363 S2d 858, 859 (Fla. Ct. App. 1978); *State ex rel. Conley v. Thompson*, 130 SE 456, 459 (W. Va. 1925); *State ex rel. Ryan v. Murphy*, 97 P. 391, 394 (Nev. 1908); *State ex rel. Van Buskirk v. Boecker*, 56 Mo. 17, 21 (Mo. 1874); *Biddle v. Willard*, 10 Ind. 62, 66-67 (Ind. 1857).

Mechem is quoted several times by the majority, but both that treatise and Throop on Public Officials hold the same:

> **§ 417. Withdrawal of Resignation.**—"A prospective resignation," it is said, "may, in point of law, amount but to a notice of intention to resign at a future day, or a

proposition to so resign; and, for the reason, that it is not accompanied by a giving up of the office—possession is still retained and may not necessarily be surrendered till the expiration of the legal term of the office, because the officer may recall his resignation—may withdraw his proposition to resign. He certainly can do this at any time before it is accepted; and after it is accepted, *he may make the withdrawal by the consent of the authority accepting, where no new rights have intervened.*"

Floyd R. Mechem, Treatise on the Law of Public Offices and Officers, § 417 (1890) (emphasis added).

Interestingly, the majority also quotes that a prospective appointment to fill an anticipated vacancy is a legal appointment and vests title to the office. How are more rights afforded a potential appointee than a duly elected Justice with due process rights to the office to which he has been elected?

The majority bases part of its rationale for determining that this resignation cannot be revoked on the case of *Smith v. Miller*, 261 Ga. 560 (407 SE2d 727) (1991). However, that case involved retirement benefits of Judges and/or Justices that had reached the age of 75. Judge Banke was 75 two days after the petition was filed, and had he not submitted his resignation, and lost the court

action, he would have lost his retirement benefits. The parties agreed to an order preventing the Governor from accepting the resignation while the matter was pending, because otherwise, the issue would have been moot for Judge Banke. That agreement left open Judge Banke's ability to withdraw the resignation. There is no question that a resignation could be withdrawn prior to acceptance, but after acceptance, it could, at best, only be withdrawn by mutual agreement. That action just guarded against a need for mutual agreement.

The majority, citing *Fitzpatrick v. Welch*, 527 P2d 313, 314-315 (Idaho 1974), expresses the fear that allowing withdrawals of resignations would be destructive to the orderly conduct of governmental affairs and the ability of an appointing authority to seek out and secure qualified persons to fill the purported vacancy. However, as stated by the Nevada Supreme Court:

> [There is no] force of the argument that the same question of public policy is involved in the withdrawal of a prospective resignation as would exist in the case of an immediate resignation. In the latter case a vacancy is at once created in the office resigned. In the former case

there is no present surrender of the office. The public is only interested in having the office filled by some competent person. If before the vacancy actually exists, the officer, who has been duly elected or appointed, elects to rescind his prospective resignation, it is not clearly apparent where the public is liable to suffer any injury.

*Murphy*, 97 P at 395.

Our contract law allows mutual modification and rescissions. See *Hanham v. Access Mgmt. Group L.P.*, 305 Ga. 414, 417 (825 SE2d 217) (2019); *Pope v. Thompson*, 157 Ga. 891, 891 (122 SE 604) (1924); *Crop Production Services v. Moye*, 345 Ga. App. 228, 232 (812 SE2d 565) (2018); OCGA § 13-5-7. Accordingly, there seems to be no reason why, at the very least, the resignation could not be mutually rescinded. However, whether such rescission is allowable or not, is not in my opinion determinative.

I am a judge that was initially appointed by Governor Deal (in a very wise and discerning move, I might add). I am not against gubernatorial appointments. However, in this instance, when the resignation will not result in a vacancy in the office until (originally) almost six months after the election, I cannot in good

conscience agree that the election should be cancelled and the will of the people thrust aside as "fruitless and nugatory." I respectfully dissent.

I am authorized to state that Judge Ballard joins in this dissent.

DECIDED MAY 14, 2020.

Election contest. Fulton Superior Court. Before Judge Richardson.

*Pope McGlamry Kilpatrick Morrison & Norwood, Wade H. Tomlinson III, Charles W. Byrd, George "Buddy" Darden, Michael J. Moore, Michael P. Morrill, Elizabeth S. White; Akin & Tate, S. Lester Tate III*; for appellant.

*Christopher M. Carr, Attorney General, Russell D. Willard, Senior Assistant Attorney General, Elizabeth T. Young, Elizabeth A. Penland, Bryan K. Webb, Assistant Attorneys General, Andrew A. Pinson, Solicitor-General*, for appellee.

*Krevolin Horst, Joyce G. Lewis, Adam M. Sparks; Hanrahan Freitag Family Law, Monica J. Hanrahan*, amici curiae.